UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY D. SWIERSKI,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>CRAIG KOENIG, Warden,<br><br>　　　　　Respondent. | Case No.  16-cv-03199-HSG (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the *pro se* petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by Petitioner Gary D. Swierski, challenging the validity of a judgment obtained against him in state court.  The operative petition is the second amended petition ("SAP").  Dkt. No. 19.  Respondent has filed an answer to the SAP, Dkt. No. 45, and Petitioner has filed a traverse, Dkt. No. 54.  For the reasons set forth below, the SAP is denied.

I.　**PROCEDURAL HISTORY**

　　**A.  Conviction and Sentencing**

On June 20, 2012, a jury found Petitioner guilty of the first degree murder of his wife, Reina.  2CT 441, 443.[1]  The trial court sentenced Petitioner to state prison for the indeterminate term of twenty-five years to life.  2CT 464, 466.  Petitioner filed a timely notice of appeal.

　　**B.  State and Federal Court Proceedings**

On November 25, 2014, the California Court of Appeal affirmed Petitioner's judgment on direct review in an unpublished decision.  Answer, Ex. F; *People v. Swierski*, No. H038846, 2014 WL 6680126, *1-21 (Cal. Ct. App. Nov. 25, 2014).  The California Supreme Court denied review on February 25, 2015.  Answer, Ex. I.

---

[1] Volume 2 of the Clerk's Transcript ("2CT") has been lodged by Respondent as Exhibit A.  *See* Dkt. No. 46-2.

With the assistance of appellate counsel, Petitioner pursued collateral review in the California Court of Appeal and California Supreme Court.  Answer, Exs. G-H.  The state appellate court noted that in his state habeas petition, Petitioner had raised two of the same issues he raised on direct appeal, and thus that petition was considered with the appeal and denied in a separate order that was concurrently filed.  *See Swierski*, 2014 WL 6680126, *1.  Petitioner's state supreme court habeas petition was also filed concurrently with his petition for review, and it was denied summarily on February 25, 2015.  Answer, Ex. H.

On May 25, 2016,[2] Petitioner filed a petition for writ of habeas corpus in this Court.  Dkt. No. 8.  Petitioner conceded that several of his claims had not been exhausted in the state courts.  Dkt. No. 6 at 1.[3]

On September 28, 2016, the Court stayed the petition pending exhaustion of Petitioner's claims in the California Supreme Court.  Dkt. No. 11.

Petitioner returned to state court, proceeding *pro se*, and on October 4, 2017, he filed a second state habeas petition in the California Supreme Court.  Answer, Ex. J.  On January 24, 2018, the state supreme court denied the petition as untimely and successive.  Dkt. No. 15 at 386.

On February 22, 2018, Petitioner filed an amended petition in this Court and moved to reopen the action, noting that the California Supreme Court had denied his state habeas petition on January 24, 2018.  Dkt. Nos. 14, 15, 16.

On April 2, 2018, the Court reopened the action and dismissed the amended petition with further leave to amend.  Dkt. No. 18.

---

[2] According to the mailbox rule, a *pro se* federal or state habeas petition is deemed filed on the date it is delivered to prison authorities for mailing. *See Saffold v. Newland*, 250 F.3d 1262, 1268 (9th Cir. 2001), *vacated and remanded on other grounds*, *Carey v. Saffold*, 536 U.S. 214 (2002) (holding that a federal or state habeas petition is deemed filed on the date the prisoner submits it to prison authorities for filing, rather than on the date it is received by the court).  The Court assumes that Petitioner delivered his state and federal petitions to prison officials on the same dates the proofs of service were signed or the same dates the petitions were signed (if no proofs of service were included). *See Koch v. Ricketts*, 68 F.3d 1191, 1193 (9th Cir. 1995) (petitioner assumes risk of proving date of mailing).

[3] Page number citations for the parties' filings refer to those assigned by the Court's electronic filing system and are located at the top right-hand corner of each page.

United States District Court
Northern District of California

On April 26, 2018, Petitioner filed his SAP, which is the operative petition in this action. Dkt. No. 19.  As grounds for federal habeas relief, Petitioner raises the following claims in his SAP as listed by the Court in its July 18, 2018 Order to Show Cause: (1) the trial court erred in denying his motion seeking dismissal of the case, filed pursuant to *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988); (2) the trial court erred in admitting a variety of prejudicial and inflammatory letters; (3) the trial court deprived him of the right to present a complete defense by threatening to admit inflammatory and prejudicial evidence if he did so; (4) the trial court erred in admitting prejudicial and inflammatory evidence, which served no purpose other than to arouse the jury's passions and prejudices; (5) the trial court erred by failing to instruct the jury on imperfect self-defense voluntary manslaughter; (6) the trial court erred in allowing the prosecution's coroner to testify extensively about the mechanics of strangulation; (7) the trial court erred in omitting relevant parts of the jury instruction that were an element of the statutory charge; (8) the trial court erred in restricting defense counsel's cross-examination of the prosecution's key witness; (9) the prosecutor committed misconduct, on multiple grounds; (10) ineffective assistance of counsel ("IAC") claims against his trial counsel, on multiple grounds; (11) appellate counsel rendered ineffective assistance, on multiple grounds; (12) law enforcement failed to preserve material, exculpatory evidence; (13) the cumulative effect of the above errors prejudiced Petitioner; and (14) there was insufficient evidence to support the conviction.  Dkt. No. 21 at 2-3.

On August 28, 2019, the Court granted Respondent's motion to dismiss the SAP in part. *See* Dkt. No. 41.  Specifically, the Court dismissed "Claim Nos. 6-9, 11, 12, and 14, and the subclaims in Claim No. 10 not presented in the petition for review or the initial state habeas petition."  *Id.* at 12.  The Court ordered Respondent to answer Petitioner's remaining claims.  *Id.* at 13.  As mentioned above, an answer to the SAP and a traverse have been filed.  Dkt. Nos. 45, 54.

Petitioner appealed the Court's August 28, 2019 Order dismissing the claims above, and in December 2019, the Ninth Circuit dismissed the appeal for lack of jurisdiction.  Dkt. Nos. 47, 52.

United States District Court
Northern District of California

## II.    STATEMENT OF FACTS

The following factual background is taken from the November 25, 2014 opinion of the California Court of Appeal:[4]

*Facts and Proceedings Below*

According to appellant, he met Reina after he placed a personal advertisement in Cosmopolitan en Español magazine. At first, they wrote and telephoned each other frequently. At the time, Reina was living in Honduras. However, in November 1997, Reina traveled to the United States to visit appellant. She stayed with appellant in Sunnyvale; they married in August 1998.  Reina was eight months pregnant at the time.

Claudia Molina worked with Reina at the Baja Fresh restaurant in Cupertino for three years. In 2005, Reina moved to the Baja Fresh restaurant in Sunnyvale. According to Molina, Reina said that she did not want to stay married to appellant; she wanted a divorce, but was afraid that appellant would take away their daughter. Reina told her that she feared for her life because appellant "had murdered his first wife."[FN 1]

[FN 1:] Defense counsel objected on hearsay grounds, but the court overruled the objection and gave the jury a limiting instruction that they were "not to take that statement for any truth contained in it that the defendant murdered his first wife but for a reason to explain now [sic] she was fearful."

Molina said that she could tell that Reina was always afraid by the expression on her face. Reina told her that appellant would spy on her and not let her go out with friends, and that appellant would record her telephone conversations. Molina said that appellant would come to the restaurant "all the time" and ask her questions about Reina, questions such as whether Reina was with someone else.

Noemi Garcia, the manager of the Cupertino Baja Fresh restaurant, testified that appellant had come to the restaurant and was "[h]ostile with Reina." He showed up at the restaurant while she was working and was "yelling" at Reina. Garcia said that she asked appellant to leave. At other times, appellant had come to the restaurant "seeing if [Reina] was inside working. Like spying on her." Appellant would drive around the restaurant and look in. Reina was nervous and "look[ed] scared."

Jennifer Glass lived with her parents in Pleasant Hill. Appellant and Reina were family friends. Sometime in 2000 or 2001, appellant and Reina came to her house on a surprise visit. Glass heard a vehicle outside the house and looked out of the window. She saw appellant and Reina in a van; they appeared to be arguing. She saw appellant punch Reina with his right fist. When Reina and appellant came to the door, Glass let them in. Reina was

---

[4] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017).  Based on its independent review, the Court finds that it can reasonably conclude that the state appellate court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

covering part of her face with her hand; she asked to use the restroom. Glass saw that Reina's lip was starting to "puff up" and there was blood around the corner of her mouth. Glass's mother, Patricia Viacava, testified that Reina's lip was "busted open." Reina was crying and scared. Reina told Viacava that appellant had "smacked her in the mouth."

From approximately 2001 to 2005, Diane Arellano lived in the same apartment complex as Reina. Reina lived in one of the apartments upstairs from Arellano with appellant, his father, and a little girl—Reina and appellant's daughter. Arellano testified that Reina never spoke to her neighbors and she did not believe that Reina and appellant had any visitors. In nice weather, Reina would sit on the stairs while her daughter played on the patio. Appellant was always watching them from the top of the stairs. Later, Reina explained that she did not talk to anyone because appellant did not want her to; he would not let her go past the stairs. Reina could watch the baby play and then she had to go back to the apartment.

Arellano testified that one night at approximately 1:00 a.m. Reina knocked on her door. Reina said, "Please, please help me. My husband's trying to kill me. Please. I'm your neighbor, Reina."[FN 2]

[FN 2]: The court overruled defense counsel's hearsay objection.

Arellano let Reina into the apartment and locked the door. Reina begged Arellano not to let appellant into the apartment. Reina was scared and was crying. Reina did not want Arellano to turn on the lights because she thought that appellant would be watching. Reina apologized and reiterated that appellant was trying to kill her; he had tried to choke her. Reina gestured toward her neck area. Reina refused to call the police. She told Arellano that appellant had threatened her and said that she could not leave him; but if she did she "wouldn't live a life." Reina told her that appellant said he would kill her, "like his first wife."[FN 3]

[FN 3]: Again, the court overruled defense counsel's hearsay objection and gave the jury a limiting instruction.

Arellano testified that Reina stayed at her apartment for several hours; then she asked Arellano to take her to a friend's house, and Arellano did.

Arellano said that she had seen bruises on Reina's arms, and that when Reina came over it was always to ask for protection. Arellano asked Reina why she did not leave appellant; Reina told her that she could not leave her daughter with appellant. After each instance where Arellano helped Reina and took her to a friend's house, something would happen to her car; twice someone put water in her gas tank, another time someone broke her windshield. After Arellano helped Reina, appellant would "just stare at" her; it was an "[e]vil stare."

Sandra Vargas and Reina worked together at Baja Fresh from 2000 to 2004. Vargas testified that she and Reina were best friends. Sometime in 2002, Reina appeared at her house unexpectedly. When Reina arrived she was quite frightened. According to Vargas, Reina was "desperate or upset" that appellant had hit her. Reina had marks on her neck. Vargas tried to persuade Reina to call the police, but Reina refused because she was afraid of appellant and feared that she would lose custody of her daughter. Reina stayed with Vargas for almost three months. Appellant came to her house to get Reina; while there he called Reina a "prostitute" and a "whore." By the end of 2004, Vargas was so afraid of appellant

that she stopped speaking to Reina.

Ted Mattman met Reina when she worked at Baja Fresh in Sunnyvale. They became friends. In December 2004, they began dating. They met two to three times a week. Initially, Reina told him that she was separated from her husband, but later admitted that she was married. According to Mattman, Reina considered divorcing appellant; he testified that she "really wanted to get out of the situation, but she felt trapped because every time she would want to get out of the situation he would threaten her and . . . scare her to the point where, you know, she wouldn't follow through." Reina was "visibly afraid" and "feared for her life." As their relationship developed, Reina confided in Mattman that appellant had punched her in the face and back and one time he strangled her and almost knocked her unconscious.

Mattman testified that one night, sometime in January or February 2005, after he dropped off Reina at about 11:20 p.m., he received a telephone call from her as he was driving home. Reina told him to "[g]o quickly" because appellant was coming after him. Later, Reina explained that when she got home appellant had been waiting for her in the bushes; he chased her with a screwdriver. Mattman asked Reina why she had not called the police. Reina said that appellant had cut himself so if the police showed up he would look injured and would say it was self-defense.

In February 2005, Reina and Mattman were having lunch together at a Quiznos restaurant when appellant approached them. Reina said that appellant had followed them. Appellant introduced himself as Reina's husband and asked Reina, "Where do you know this guy from?" After a tense silence, Reina said that she had to leave. Reina told Mattman on multiple occasions that she would be out with friends and appellant would appear. Sometimes he would have their daughter with him and would say things to her that would upset her.

After Reina's death, appellant appeared at Mattman's place of work. Appellant told the receptionist that his name was "Steve." When Mattman saw that "Steve" was appellant, he told the receptionist to call the police.

In 1985, appellant and Mansueta Casinillo had a daughter, Eva Swierski. Eva was born in New York. While the family was living there, Eva saw an incident in which appellant struck Casinillo. Casinillo went into a closet and cried.

When Eva was about eight years old, she moved to Santa Clara with her mother. Later, appellant moved to Sunnyvale. Appellant and Casinillo did not live together. Eventually, appellant gained legal custody of Eva. Casinillo contested the custody arrangement; a lengthy series of court proceedings concerning Eva's custody ensued.

Repeatedly during her teenage years, Eva ran away from home. She testified that when she was in high school, appellant choked her in an attempt to stop her sucking her thumb. Appellant yelled at her and called her "fat," a "loser," and a "whore." When appellant married Reina, Eva lived with them. Eventually, appellant and Reina began having arguments over money because Reina was unwilling to contribute her income to paying the bills. Eva described a fight in which appellant "slammed" Reina "into a wall . . . ."

Appellant told Eva that he believed Reina was "cheating on him." Appellant said that he

"caught her with somebody." Appellant called Reina a "fucking whore," and said that if she left him he would "kill her." A short time before Reina died, appellant drove Eva to a wooded location. He told Eva that he "was planning on killing [Reina] and so maybe he's going to put her there, or something." Appellant told Eva to buy a bag and a shovel; she purchased the items from a Big 5 store.

On March 8, 2005, Eva was out drinking and smoking marijuana with her friends. Appellant telephoned her twice and insisted that she return home immediately. According to Eva, during the second telephone call appellant appeared to be upset. After the second telephone call, Eva returned home. When Eva arrived home appellant told her that he had choked Reina to death. Eva said she suggested that they call an ambulance, but appellant told her that it was "probably too late." Eva went with appellant to the master bathroom. Appellant showed Eva a big plastic bag in the bathtub. He said that Reina's body was in the bag. Initially, Eva described it as a garbage bag, but later testified that it was "a different type of bag" with handles.

Eva went downstairs; she lay on the floor and cried. Appellant told Eva to help him carry Reina's body to his vehicle, but Eva said she did not want to. Appellant became frustrated and upset; he shook Eva. He shouted at Eva and told her that she could not tell anyone or he was "going to hurt" her or them. Eventually, Eva helped appellant carry Reina's body down the stairs.

Appellant and Eva took Reina's body to appellant's vehicle and loaded it into the trunk. Appellant asked Eva to drive, but she refused. Eva rode in the passenger seat for somewhere between 30 minutes and an hour. They went "someplace in the hills." It appeared that they were "[i]n the woods somewhere." Eva was not certain that they were in the same place that appellant had taken her previously. Appellant parked his vehicle, took Reina's body out of the trunk, and carried it up a small hill. He was gone for approximately an hour. Eva stayed in the vehicle and cried. When appellant returned to the vehicle they drove home. Appellant asked Eva to dispose of a pair of pants and Reina's cellular telephone. Appellant told Eva not to tell anyone because he did not "want to have to hurt anybody else."[FN 4]

[FN 4]: Eva admitted on cross-examination that she had a learning disability that affects her memory, but she was not quite sure how; and her drug use made it difficult for her to remember details.

Months after Reina was killed, appellant told Eva that "he went back to get the teeth." At the time the police were asking questions about Reina's teeth.

In February 2011, Eva was concerned for her safety because someone was breaking into her home. She decided to move to Michigan with her daughter and her mother. Eva intended to confess to the police in Michigan about her role in Reina's death once her mother and daughter were safe with an aunt. However, while driving, Eva's mother decided she did not want to go. Eva went to the nearest police station, which was in Auburn, and told them her story.

On April 4, 2008, Alex Vido and her boyfriend discovered a skull while hiking just off Highway 9. Vido and her boyfriend were originally heading for Castle Rock State Park, but the road was closed due to an accident and so they pulled over to the side of the road. The

place where they hiked appeared to be a fire trail. Vido took a photograph of the skull and found a CHP officer; two officers followed them back to where they had found the skull. The prosecution and the defense stipulated that based on dental X-rays a dentist had determined that it was Reina's skull.

Forensic anthropologist Lauren Zephro testified that she examined a skull, which had the first vertebra attached and a portion of the hyoid bone. The hyoid bone sits high on the neck behind the mandible. The skull did not appear to have decomposed at the location where it was found; and the skull did contain a full set of teeth. Zephro removed two of the teeth and sent them to the Santa Clara County Crime Laboratory for DNA analysis. Zephro estimated that the skull had been there for five years. The bag was very decomposed, but "did retain context" so she could see that the skull was contained within the bag. On cross-examination, defense counsel established that the hyoid bone is U-shaped and the part that was found was the bottom of the U; the condition of the bone indicated that it had been attached to the rest of the U by cartilage. The part of the bone Zephro examined was not fractured.

Criminalist Michelle Halsing, a specialist in DNA analysis, obtained DNA samples from appellant and from Laura (appellant's and Reina's daughter). Based on her analysis of these samples and the DNA collected from the teeth from the skull, Halsing determined that there was a high likelihood that the skull belonged to Reina.

Lieutenant Craig Anderson of the Sunnyvale Department of Public Safety described a drive that he and Detective Greg Giguiere conducted with Eva directing them. The drive started at appellant's Sunnyvale home and went to where Eva's best recollection was of where appellant stopped on the night of Reina's death. Later the detectives went back and videotaped the route they had traveled. The video recording was played for the jury with Lieutenant Anderson narrating. Lieutenant Anderson testified that Eva had described certain things, such as a light pole and a four-way stop that they found were on the route. They drove straight at the four-way stop sign into a very remote area. However, on the drive back, at the four-way stop sign a right turn took them to the area where Reina's skull was located in 2008. Lieutenant Anderson testified that approximately three and one-half miles after the turn there was a fire trail gate and a small hill; this was where Reina's skull was located.

Detective Giguiere testified that he received a telephone call from the Auburn Police Department on February 22, 2011. He was informed that Eva had come in to the police department and described the details surrounding Reina's death. Detective Giguiere went to Auburn and interviewed Eva. His description of what she told him confirmed the main points of Eva's testimony. Eva told him that appellant had physically abused her. Detective Giguiere obtained records from Child Protective Services, which indicated that Eva had been made a ward of the court between 2000 and 2002 based on her reporting that she had been abused by appellant.

### Uncharged Acts of Domestic Violence

Appellant's first wife, Mansueta Casinillo, testified that she met appellant when a friend posted her description in Cherry Blossom magazine. Casinillo was born in the Philippines. She corresponded with appellant for three years and then moved to New York to live with him; they married in 1983 or 1984. Their daughter, Eva, was born in July 1985.

Appellant called Casinillo lots of derogatory names including "stupid" and "whore." He

would belittle her for her accent and her inability to find employment as a social worker. Appellant punched and slapped her and forced her to have sex against her will. Once, he spat in her food while she was cooking. On another occasion, Casinillo suffered an asthma attack and appellant told Casinillo to "shut the F up" and to "be quiet."

Appellant threatened to kill Casinillo if she ever left him. Nevertheless, Casinillo moved to California, where appellant's sister offered to provide Casinillo a place to live. Eventually, Casinillo filed for divorce from appellant; that was followed by several years of litigation over custody and child support.

Elizabeth Armijo testified that she was born in Bolivia and had a romantic relationship with appellant. While she was working as a cashier at a Burger King, she met appellant, who was a frequent customer. Eventually, Armijo moved into an apartment with appellant. From that point on, their relationship changed.

Armijo testified that on May 31, 1996, she was driving with appellant and they were arguing. They were on their way to pick up Armijo's son from school; Armijo felt that appellant was causing her to be late. Armijo told appellant that she could not drive safely when they were arguing and she asked him to get out of the vehicle. Appellant began screaming obscenities into Armijo's ear. Armijo attempted to push him away. Appellant responded by punching Armijo "very hard" in the face. He grabbed her by the neck and tried to choke her. Armijo drove back to their apartment, locked the door, and called the police. She had bruises and swelling of her neck as a result of this incident. Officer Shellie Rice of the Sunnyvale Department of Public Safety, who responded to Armijo's call to the police, described Armijo's injuries in detail for the jury.

Immediately after this incident, Armijo terminated her relationship with appellant. He threatened to have Armijo deported if she did not come back to him. Lieutenant Gary Anderson testified that in a search of appellant's home he found letters relating to Armijo that were addressed to various government agencies such as the INS; "the letters were reports on" Armijo "in efforts to get her deported." Shortly after the incident where appellant punched and tried to choke Armijo, immigration authorities detained Armijo. Unexpectedly, appellant showed up at her deportation hearing; he offered to marry her in order to enable her to avoid deportation. Armijo refused and was deported.

Appellant testified in his own defense that at approximately 10:30 p.m. on the night Reina died he was awakened by her cellular telephone beeping. He went into the bathroom to turn it off. Reina woke up and came into the bathroom; she began cursing loudly in Spanish. Reina asked him what he was doing with her telephone; she said, "I told you don't ever look at my phone . . . ." Appellant said that "all of a sudden, she picked up this knife that we had in the bathroom that we use[d] for . . . a back scratcher." Then, "she says to me, you know—with her back to me, she's 'I'm going to kill you tonight, motherfucker.'" Appellant demonstrated how Reina turned around with the knife held high and came at him and stabbed him. Reina stabbed him in the forearm.

Reina pulled the knife out of appellant's arm and raised her arm again. She attempted to stab appellant, but missed. According to appellant, Reina raised the knife a third time. Appellant punched her in the face. Reina fell into the bathtub onto a large garbage bag containing old clothing, which they stored in the bathtub. Her head fell into the bag; appellant fell on top of

Reina.

Appellant said he took the knife from Reina's hand and stood up. Reina was motionless in the bathtub, but appeared to be breathing. Appellant said he was concerned that she would regain consciousness and call the police or that a neighbor might call them. He explained that he telephoned Eva to come home so that someone would be in the house to look after the younger children when the police arrived.

Appellant said that he tried to shake Reina to wake her up, but she did not respond. He called Eva again and insisted that she come home. Appellant testified that he took Reina out of the bathtub and administered CPR for 10 minutes. When he realized that Reina was dead, he panicked. He stuffed her body into a black duffel bag.

When Eva returned home approximately 30 to 45 minutes later, she urged him to telephone 911, but he thought it was pointless because he was sure Reina was dead. When Eva insisted on telephoning the police, appellant threatened to tell them that she was involved in Reina's death. Eva did not telephone the police, but she refused to help him carry Reina's body downstairs. Appellant said he carried the body by himself and placed it in the backseat of his vehicle. He insisted that Eva accompany him because he was concerned that if he left her behind she would telephone the police. Appellant denied that he had asked Eva to drive his vehicle.

Appellant drove toward Monte Sereno where he had worked before on a construction job. He stopped his vehicle near Saratoga. He carried Reina's body across the road and up a hill; Eva stayed in the vehicle. Appellant put the bag down and left it without burying it; he returned to his vehicle. He drove home with Eva. The next day, he returned on his motorbike with a shovel and buried the bag. He never returned to that location.

Appellant said that he did not realize that Reina was having an affair with Mattman until the police mentioned it after her death.

In rebuttal, Officer Brian Wilkes of the Sunnyvale Department of Public Safety testified that he was the first officer to contact appellant following Mattman's report that Reina was missing. He testified that appellant stated that Reina "had packed some belongings and had left[ ]" and that he "believed that she may be having an affair and this was not unusual for her to just leave." Officer Wilkes said that appellant was the first person to mention an affair.

The jury deliberated for less than seven hours before finding appellant guilty of first degree murder.[FN 5]

[FN 5]: During this time, the jury listened to read-backs of a portion of appellant's testimony and several different portions of Eva's testimony totaling 47 minutes.

*Swierski*, 2014 WL 6680126, *1-7 (footnotes in original).

III.   **DISCUSSION**

   A.   **Standard of Review**

   A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

   A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

   Section 2254(d)(1) restricts the source of clearly established Federal law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).  A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  *Id.* at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court

11

identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, the Court reviews the "last reasoned decision" by the state court. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

As mentioned above, in its unpublished disposition issued on November 25, 2014, the state appellate court addressed the merits of Petitioner's remaining claims in his SAP. *Swierski*, 2014 WL 6680126, *7-21. Therefore, the last reasoned decision as to these claims is the state appellate court's unpublished disposition. *See Wilson*, 138 S. Ct. at 1192; *Cannedy*, 706 F.3d at 1156.

Petitioner also raised his IAC claims on collateral review in the California Court of Appeal and California Supreme Court. *See* Answer, Exs. G-H. These claims were summarily denied by the state courts. *See Swierski*, 2014 WL 6680126, *1; Answer, Ex. H.

A summary denial is presumed to be a denial on the merits of the Petitioner's claims. *Stancle v. Clay,* 692 F.3d 948, 957 & n.3 (9th Cir. 2012). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).

When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review . . . is not de novo review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state

1    court decision is objectively unreasonable." *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir.

2    2003).  "Where a state court's decision is unaccompanied by an explanation, the habeas

3    petitioner's burden still must be met by showing there was no reasonable basis for the state court

4    to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

5           The Supreme Court has repeatedly affirmed that under AEDPA, a federal habeas court

6    must give a heightened level of deference to state court decisions.  *See Hardy v. Cross*, 132 S. Ct.

7    490, 491 (2011) (per curiam); *Harrington*, 562 U.S. at 97-100; *Felkner v. Jackson*, 131 S. Ct.

8    1305 (2011) (per curiam).  As the Court has explained, "[o]n federal habeas review, AEDPA

9    'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-

10   court decisions be given the benefit of the doubt.'"  *Id.* at 1307 (citation omitted).  With these

11   principles in mind, the Court addresses Petitioner's claims.

       **B.    Petitioner's Claims**

12          Before the Court are the remaining claims from the SAP: (1) the trial court erred in

13   denying his *Trombetta/Youngblood* motion (Claim 1), Dkt. No. 19-1 at 1, 10-16; (2) his rights to a

14   fair trial and effective assistance of counsel were violated by the introduction into evidence of

15   prejudicial and inflammatory letters he had written (Claim 2), Dkt. No. 19-3 at 1, 25-32; (3) the

16   trial court deprived him of the right to present a complete defense by threatening to admit

17   inflammatory and prejudicial evidence if he did so (Claim 3), Dkt. No. 19-1 at 1, 27-34; (4) the

18   trial court erred in admitting evidence of his prior uncharged acts of domestic violence (Claim 4),

19   Dkt. No. 19-1 at 50-57; (5) the trial court erred by failing to instruct the jury on imperfect self-

20   defense voluntary manslaughter (Claim 5), Dkt. No. 19-1 at 58-69; (6) IAC claims against his trial

21   counsel for failing to object to (a) coroner Dr. Jorden's testimony, Dkt. No. 19-3 at 53-55 and

22   (b) two instances of prosecutorial misconduct (Claim 10), Dkt. No. 19-3 at 1, 55-58; and (7) the

23   cumulative effect of the above errors prejudiced Petitioner (Claim 13), Dkt. No. 19-6 at 1-5.

       **1.    *Trombetta/Youngblood* Claim (Claim 1)**

24          Petitioner contends his constitutional rights were violated by the denial of his

25   *Trombetta/Youngblood* motion before trial.  Dkt. No. 19-1 at 1, 10-16.

### a.   Factual Background

On June 9, 2005, Lieutenant Craig Anderson, who was then still a detective, executed a search warrant on Petitioner's Sunnyvale residence.  3RT 153-55, 170.[5]  At that time, Anderson seized several audio cassette tapes.  3RT 157-58.  Anderson had said the following to Petitioner:

> Yeah, I took—we took numerous, tape recorders, numerous audio cassettes, audio cassettes of you tape recording phone calls with me which is illegal.  Audio cassettes of conversations I had with Eva on the telephone which is illegal.  All kinds of stuff like that.  *Audio cassettes apparently that you had of arguments with Reina* that were apparently it's a concealed, concealed audio cassette record, things like that.

1CT 210[6] (emphasis added).  At a subsequent hearing, Anderson explained that he had not actually listened to the cassette tapes at the time of his conversation with Petitioner:

> Then I use the word "apparently" a couple times. I wasn't referring to something that I had listened to. I was referring to something that—and I can't recall how I became aware of this. Either was told to me by another detective or another officer or if I was just referencing what we had learned during the investigation of Reina's accusations of him recording her.

3RT 162.  Anderson testified that he had "no recollection" of listening to any recording in which Petitioner and Reina yelled at each other.  3RT 162.  He did acknowledge describing to Petitioner a recording of Reina "going off on something" in Spanish.  3RT 164.  Anderson further testified that he sometimes provided false information to suspects as an investigative tool.  3RT 171.  Anderson claims that he employed this technique with Petitioner.  3RT 172.

Upon collecting the audio cassette tapes from Petitioner's residence, Anderson made copies and booked the originals into evidence.  3RT 170-71.  Anderson subsequently listened to all of the audio cassette tapes in his possession.  3RT 166.  He found no cassette tape of Reina yelling in Spanish.  3RT 166.

As of March 12, 2010, the prosecution had provided eight audio cassette tapes to the defense, while technical difficulties delayed the duplication of three other tapes.  1CT 214-15.  Defense counsel declared that she received the last tapes on April 3, 2012.  1CT 206; *see* 1CT 197.

---

[5] Volume 3 of the Reporter's Transcript ("3RT") has been lodged by Respondent as Exhibit C. *See* Dkt. No. 46-4.

[6] Volume 1 of the Clerk's Transcript ("1CT") has been lodged by Respondent as Exhibit A.  *See* Dkt. Nos. 46-1 and 46-2.

United States District Court
Northern District of California

1    Defense counsel noted that none "of the tapes contain[ed] recordings of Reina yelling or arguing

2    with Mr. Swierski, the recordings that Det. Anderson had already confirmed in his report that he

3    had seized and had knowledge of its contents." 1CT 197.

4         Petitioner filed a motion to dismiss, claiming that the prosecutor had intentionally

5    destroyed exculpatory evidence, in violation of *California v. Trombetta*. 1CT 194.  After a

6    contested hearing, the trial court denied the motion.  The trial court concluded as follows: "I don't

7    think the motion is well taken.  I—I don't think there's evidence that the tapes—tape actually

8    existed or in terms of their exculpatory value or that the police should have known of their

9    exculpatory value.  And so I'm going to deny the motion." 3RT 185.

### b.  State Court Decision

11   The state appellate court rejected Petitioner's *Trombetta/Youngblood* claim as follows:

12        The constitutional due process rights of a defendant may be implicated when he or she is
13   denied access to favorable evidence in the prosecution's possession.  (*Brady v. Maryland*
     (1963) 373 U.S. 83.)  *Trombetta* outlines how the state's failure to preserve evidence may
14   violate those rights.  In *Trombetta*, the high court limited the state's affirmative duty to
     preserve evidence to that which "might be expected to play a significant role in the suspect's
15   defense."  (*Trombetta*, *supra*, 467 U.S. at p. 488.)  This standard of "constitutional
     materiality" imposes two requirements that a defendant must meet in order to show a due
16   process violation.  As an initial matter, the evidence must "possess an exculpatory value that
     was apparent before [it] was destroyed."  (*Id.* at p. 489.)  Additionally, it must "be of such a
17   nature that the defendant would be unable to obtain comparable evidence by other reasonably
     available means."  (*Ibid.*)
18

19        Destroyed evidence with only potential, rather than apparent, exculpatory value is without
20   remedy under *Trombetta*, but *Youngblood*, *supra*, 488 U.S. 51 provides a limited remedy
     when the state has acted in bad faith in failing to preserve the evidence.  In *Youngblood*,
21   police obtained semen samples from a rape kit and several items of clothing, but they could
     not definitively establish the identity of the assailant through their initial tests.  (*Id.* at pp.
22   52–54.)  Subsequently, the police failed to take measures necessary to preserve those
     samples, such as refrigerating the clothing.  (*Id.* at p. 54.)  Although properly preserved
23   samples could have exculpated the defendant in that case, that evidence was only
24   "potentially useful" (*Id.* at p. 58) to the defense and not "'potentially exculpatory'" at the
     time it was allowed to deteriorate.  (*Id.* at p. 57.)  The court held that "unless a criminal
25   defendant can show bad faith on the part of the police, failure to preserve potentially useful
     evidence does not constitute a denial of due process of law."  (*Id.* at p. 58.)

26
27        We review the trial court's decision on a *Trombetta*/*Youngblood* motion under the
     substantial evidence standard.  (*People v. Montes* (2014) 58 Cal. 4th 809, 837;  *People v.*
28   *Memro* (1995) 11 Cal. 4th 786, 831.)  "In assessing a claim of insufficiency of evidence, the

reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value . . . " in support of the court's decision.  (*People v. Rodriguez* (1999) 20 Cal. 4th 1, 11.)  " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." [Citations.]' [Citation.]" (*Ibid.*)

We note three things for the record. First, defense counsel received copies of all the tapes that were taken from appellant's home; she so declared in her declaration in support of the *Trombetta/Youngblood* motion.  Second, Lieutenant Anderson testified that there were no recordings of appellant and Reina arguing or of Reina "going off" in Spanish.  The trial court was entitled to credit Lieutenant Anderson's testimony. The testimony of a single witness is sufficient to prove a disputed fact. (*People v. Young* (2005) 34 Cal. 4th 1149, 1181.) Third, assuming that there was another tape out there somewhere that contained either Reina arguing with appellant or Reina "going off" in Spanish, and assuming that the tape contained precisely the evidence that appellant now posits that it did, its absence "did not deny [appellant] all opportunity 'to obtain comparable evidence by other reasonably available means.' [Citation.]" (*People v. Thomas* (2012) 54 Cal. 4th 908, 929.)  To the contrary, the trial court authorized admission of evidence of Reina's character for violence.  Specifically, the court permitted defense counsel to elicit testimony from appellant's daughters about arguments between appellant and Reina and acts of violence by Reina against appellant pursuant to Evidence Code section 1103.[FN 8]

[FN 8]: The court indicated that it was going to allow the daughters to testify about Reina's acts of violence toward appellant and "those would come in under a [Evidence Code section] 352 analysis."  With respect to acts of violence against the girls, the court was not sure of their relevance.  When defense counsel argued that under Evidence Code section 1103 she was not limited to showing just acts of violence by Reina against appellant, the court noted that unless the court knew what appellant's defense was going to be, the court could not conduct a "352 analysis."

Respondent argues that appellant may not be heard to complain of a *Trombetta* violation when he not only possessed evidence comparable to that allegedly destroyed, but refused even to introduce it.  Appellant counters that it is reasonable to assume that the primary reason counsel decided not to call appellant's daughters was her concern that they would say something that might open the door to the prosecution's questioning appellant about the death of another intimate partner.  Nevertheless, as the California Supreme Court has explained in another context, " ' "[t]he criminal process . . . is replete with situations requiring the 'making of difficult judgments' as to which course to follow.  [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." ' [Citations.]" (*People v. Letner and Tobin* (2010) 50 Cal. 4th 99, 153 [the defendant did not offer any authority supporting his claim that despite proper joinder of the trial, the strategic decision he was required to make between testifying and remaining silent resulted in a gross unfairness amounting to a denial of due process and in other respects denied him his constitutional rights].)

In sum, we find no due process violation and the trial court did not err in denying appellant's

*Trombetta*/*Youngblood* motion.

*Swierski*, 2014 WL 6680126, **7-9 (footnotes in original).

### c.   Analysis

The government has a duty to preserve material evidence, *i.e.,* evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means.  *See Trombetta*, 467 U.S. at 489; *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997).

Although the good or bad faith of the police is irrelevant to the analysis when the police destroy material exculpatory evidence, the analysis is different if the evidence is only potentially useful: there is no due process violation unless there is bad faith conduct by the police in failing to preserve potentially useful evidence.  *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Youngblood*, 488 U.S. at 58; *United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013); *Villafuerte v. Stewart*, 111 F.3d 616, 625 (9th Cir. 1997).  Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57.  Another configuration of this test is that a constitutional violation will be found if a showing is made that 1) the government acted in bad faith, the presence or absence of which turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, and 2) that the missing evidence is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Sivilla*, 714 F.3d at 1172 (internal quotation marks omitted).

Negligent failure to preserve potentially useful evidence is not enough to establish bad faith and does not constitute a violation of due process.  *See Grisby*, 130 F.3d at 371; *see, e.g.*, *Sivilla*, 714 F.3d at 1172 (finding that where exculpatory value of destroyed evidence was not apparent, government's negligent failure to preserve it did not establish bad faith).

Here, the state courts reasonably applied *Trombetta* and *Youngblood* in rejecting Petitioner's claim that the police destroyed exculpatory evidence in the form of audio cassette tapes of alleged arguments with Reina.  *Swierski*, 2014 WL 6680126, **8-9.  The state appellate court noted "three things for the record." *Id.* at *9.  First, as the state appellate court found, trial

counsel received copies of all the tapes taken from Petitioner's home. *Id.* Indeed, while Petitioner in state court claimed his counsel had not received all the tapes, *see* Dkt. No. 46-5 at 592, the record shows that trial counsel declared under penalty of perjury that she had actually received all of the tapes, *see* 1CT 206; *see also* 1CT 197.

Second, Lieutenant Anderson testified that "there were no recordings of [Petitioner] and Reina arguing or of Reina 'going off' in Spanish." *Swierski*, 2014 WL 6680126, *9. The state appellate court determined that "[t]he trial court was entitled to credit Lieutenant Anderson's testimony." *Id.* (citing *People v. Young*, 34 Cal. 4th 1149, 1181 (2005) (testimony of a single witness is sufficient to prove a disputed fact). Thus, the trial court made the factual finding that Lieutenant Anderson was credible when he testified that he had listened to all tapes taken from Petitioner's house and found none in which Reina yelled or argued with Petitioner. 3RT 166, 184, 185; *Swierski*, 2014 WL 6680126, *9. Such findings are entitled to a presumption of correctness under § 2254. *See Dyer v. Calderon*, 151 F.3d 970, 975 (9th Cir. 1998) ("So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness."). To rebut this presumption, a petitioner must present clear and convincing evidence establishing that the state courts' findings were erroneous. *See* 28 U.S.C. § 2254(e)(1); *Taylor*, 366 F.3d at 1000 ("Once the state court's fact-finding process survives this intrinsic review [,] . . . the state court's findings are dressed in a presumption of correctness [ ]" and may be overturned only if new evidence presented for the first time in federal court "amounts to clear and convincing proof that the state-court finding is in error."). Here, Petitioner has failed to demonstrate any flaw in the state courts' fact-finding process, or present any evidence, let alone clear and convincing evidence, to support his claim. As such, the Court may properly defer to the state courts' findings that no such evidence existed or that there was no showing that "the police should have known of [the] exculpatory value" even had it existed. *See* 3RT 185. In this regard, the state appellate court reasonably denied this claim upon finding no due process violation and concluding that the trial court did not err in denying Petitioner's *Trombetta/Youngblood* motion.

And third, assuming that there was another tape out there somewhere that contained what

United States District Court
Northern District of California

1   Petitioner describes—him and Reina arguing, or Reina yelling at him in Spanish—it was not "of

2   such a nature that [Petitioner] would be unable to obtain comparable evidence by other reasonably

3   available means." *Trombetta*, 467 U.S. at 488-89.  As the state appellate court pointed out, *see*

4   *Swierski*, 2014 WL 6680126, *9, the trial court actually authorized admission of evidence of

5   Reina's character for violence, specifically testimony by Petitioner's daughters about arguments

6   between Petitioner and Reina, pursuant to California Evidence Code § 1103, *see* 8RT 724-25.

7   Defense counsel, however, ultimately declined to introduce that testimony.  *See* 8RT 740.

8   Respondent argues that "Petitioner may not be heard to complain of a *Trombetta* violation when

9   he not only possessed evidence comparable to that allegedly destroyed, but refused even to

10  introduce it."  Dkt. 45-1 at 26.  The Court finds that the state appellate court noted that Petitioner

11  countered the same argument on direct appeal by stating that "it is reasonable to assume that the

12  primary reason counsel decided not to call [Petitioner]'s daughters was her concern that they

13  would say something that might open the door to the prosecution's questioning appellant about the

14  death of another intimate partner." *Swierski*, 2014 WL 6680126, *9.  However, the state appellate

15  court pointed out that strategic decision involving making such "difficult judgments" as to which

16  course to follow happens frequently in the criminal process, and that "[a]lthough a defendant may

17  have a right, even of constitutional dimensions, to follow whichever course he chooses, the

18  Constitution does not by that token always forbid requiring him to choose." *Id.* (citing *People v.*

19  *Letner and Tobin*, 50 Cal. 4th 99, 153 (2010)).

20        In sum, the Court finds the state appellate court reasonably denied this

21  *Trombetta/Youngblood* claim because Petitioner fails to establish that the contents of the

22  hypothetical audio cassette tapes, including alleged arguments with Reina, would have been

23  exculpatory.  As the trial court noted, Petitioner provided no evidence concerning when the

24  hypothetical audio cassette tape was created, or whether it would have demonstrated Reina's

25  character for violence.  3RT 180-183.  And to establish a *Trombetta* violation, Petitioner must

26  show that that the destruction of exculpatory evidence resulted from bad faith, rather than mere

27  negligence.  *See Grisby*, 130 F.3d at 371.  Because Petitioner cannot show that the hypothetical

28  audio cassette tape even existed, Petitioner fails to make such a showing.  In the absence of any

evidence of a calculated or conscious decision to destroy the alleged exculpatory evidence, Petitioner's claim of error must fail.  *See Trombetta*, 467 U.S. at 488 ("The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence").  Based on the foregoing, the state appellate court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to habeas relief based on Claim 1.

### 2. Denial of Rights to Fair Trial and Effective Assistance of Counsel Based on Admission of Prejudicial and Inflammatory Letters (Claim 2)

Claim 2 is based on two grounds as Petitioner alleges that (1) his right to due process and (2) his Sixth Amendment right to effective assistance of counsel were violated by the erroneous admission of prejudicial and inflammatory letters.  Dkt. No. 19-3 at 1, 25-32.

### a. Factual Background

As mentioned above, on June 9, 2005, police officers executed a search warrant on Petitioner's residence in Sunnyvale.  7RT 557, 592.[7]  Officers seized a large quantity of papers and documents.  7RT 561, 594.  Among the documents seized were the following letters written by Petitioner and admitted into evidence as People's Trial Exhibits 6, 34, 35 and 43.  *Swierski*, 2014 WL 6680126, *18.

People's Trial Exhibit 6 was a letter addressed to the Mayor of Sunnyvale.  *See id.* Petitioner accused Sandra Vargas, who had worked with Reina at Baja Fresh from 2000-2004, of driving "while intoxicated" and/or "under the influence of illegal drugs."  *Id.*  Petitioner further accused Vargas of driving with small children who were not restrained in car seats.  *Id.*; *see* 5RT 273[8]; 9RT 1033-34[9].

---

[7] Volume 7 of the Reporter's Transcript ("7RT") has been lodged by Respondent as Exhibit C. *See* Dkt. No. 46-4.

[8] Volume 5 of the Reporter's Transcript ("5RT") has been lodged by Respondent as Exhibit C. *See* Dkt. No. 46-4.

[9] Volume 9 of the Reporter's Transcript ("9RT") has been lodged by Respondent as Exhibit C. *See* Dkt. No. 46-4.

People's Trial Exhibit 34 consisted of several letters regarding the deportation of Petitioner's former girlfriend, Elizabeth Armijo, and her son. *Swierski*, 2014 WL 6680126, *18. As explained in the statement of facts above, Petitioner had previously been romantically involved with Armijo, who testified that Petitioner had punched and tried to choke her during an incident in 1996. *Id.* at *5-6. In one letter, Petitioner asked the Internal Revenue Service to prosecute Armijo for tax evasion and fraud because she worked as an illegal alien. *Id.* at *18. In another letter, Petitioner asked the Immigration and Naturalization Service to prohibit Armijo from working pending her deportation, and suggested instead that "sale of her vehicle to raise funds [was] more appropriate at this time." *Id.*; *see* 7RT 566.

People's Trial Exhibit 35 was a handwritten note to an unknown recipient. *Swierski*, 2014 WL 6680126, *18. According to the prosecutor, Petitioner wrote, "What you are now is what you will always be: dumb blond, bimbo, white trash, nig, 'n-i-g,' lover, black cock sucker, bleach blond, zebra baby maker, Oreo cookie, Oreo cookie maker, half breeds, mutts." *Id.*; *see* 7RT 565, 567.

Finally, People's Trial Exhibit 43 was a 2002 letter about Reina addressed to Secretary of Defense Donald Rumsfeld and copied to United States Homeland Security Advisor Tom Ridge and Senate Majority Leader Tom Daschle. *Swierski*, 2014 WL 6680126, *18. Petitioner wrote,

> With our national security at risk from the ever increasing threat of domestic terrorism from al-Qaeda and/or others, I feel that I should do my civic duty and inform you of my unamerican wife and her feelings toward the U.S.A. and her feelings about helping a potential terrorist obtain a real license by fraud.

*Id.* Petitioner also advised, "If something catastrophic were to happen and it could be connected to Reina it would be a real tragedy to think that no action was taken. I would then say, I told you so." *Id.*; *see* 9RT 1035-36.

### b. State Court Decision

The state appellate court described further factual background for this claim and rejected it as follows:

> In limine, defense counsel requested exclusion of all the evidence seized in the search of appellant's residence pursuant to Evidence Code section 352, including all books, magazines, notes, newspaper, clippings, and DVDs. During the hearing on defense

21

counsel's in limine motions, the prosecutor asked if the court could come back to defense counsel's request to exclude this evidence because he "ha[d] a list" that he did not have with him. The court agreed to revisit the issue later. Later in the afternoon session, the prosecutor told the court in relation to defense counsel's request to exclude the evidence seized from appellant's residence, "[Defense counsel] wants to know what evidence of all the evidence that's been collected that I intend to introduce. And I want to be complete in my response. So I'd like to hold off on that as well." After Vargas testified, defense counsel objected to exhibit No. 6 (the letter to the Mayor of Sunnyvale) on the ground that there was no foundation laid that appellant actually sent the letter. The court agreed with defense counsel and told the prosecutor that the letter was not going to come into evidence. However, at the end of the testimonial portion of the trial, the prosecutor moved to have the letter admitted into evidence; the court admitted exhibit No. 6 without any contemporaneous objection from defense counsel. Similarly, exhibit No. 43 and exhibit Nos. 34 and 35 were admitted into evidence by the court without any contemporaneous objection by defense counsel. We can find nothing in the record to support the conclusion that the court ruled on the admissibility of exhibit Nos. 43, 34 and 35.

Appellant argues that "[i]n light of the unclarity [sic] as to whether defense counsel objected to the admission of the letters, and if so how the court ruled on the objection, [he] submits in the alternative that either the court erred by admitting them over appellant's objection, or defense counsel's failure to object 'fell below an objective standard of reasonableness' and thus constituted ineffective assistance."

Respondent argues that all the letters were admissible under Evidence Code section 1101, subdivisions (a) and (b) on the issue of appellant's intent and motive to inflict emotional distress on appellant's romantic partners as well as anyone who helped his romantic partners get away from him. We are not persuaded. The problem with the respondent's argument is that the jury was never instructed pursuant to CALCRIM No. 375 on using exhibit Nos. 6, 34, 35, and 43 for a limited purpose of proving appellant's intent and motive. Absent such an instruction the only purpose for admitting the letters was to show that appellant had a character trait for vindictiveness. The prosecutor made this point when cross examining appellant. Immediately before cross examining appellant about the Vargas, Arellano, and Rumsfeld letters, he asked appellant "When you don't like someone or they're against you, you go all out to destroy them, don't you?" After questioning appellant about the letter he wrote to the homeowner's association about Arellano, the prosecutor made the point again, "Like I say . . . when . . . someone's against you, you'll go to any means to destroy them."[FN 14]

[FN 14]: Evidence Code section 1101, subdivision (c), does not prohibit admission of evidence of uncharged prior conduct to attack a defendant's credibility. It expressly provides: "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." Since the prosecutor did not suggest at any point that the content of the letters was false, they could not have been introduced for the purpose of attacking appellant's credibility.

That being said, whether we analyze this issue as the trial court abusing its discretion in admitting this evidence, or defense counsel's failure to contemporaneously object to the admission of exhibit Nos. 6, 34, 35, or 43 into evidence, we find the error harmless.

22

If we address the issue as one of ineffective assistance of counsel, appellant has the burden of showing "there is a reasonable probability that [he] would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal. 4th 926, 1003; see generally *Strickland*, *supra*, 466 U.S. at pp. 687–694.) If we address the issue as one of evidentiary error, reversal is required "only if a reasonable probability exists that the jury would have reached a different result had [the] evidence been excluded. [Citations.]" (*People v. Whitson* (1998) 17 Cal. 4th 229, 251; *Watson*, *supra*, 46 Cal. 2d at p. 836; see *People v. Samuels* (2005) 36 Cal. 4th 96, 113 [applying *Watson* standard to erroneous admission of character evidence].)

As we have explained *ante*, the evidence of appellant's guilt was overwhelming. Appellant fails to show a reasonable probability of a more favorable outcome but for the alleged evidentiary error and/or failure of defense counsel to object to the admission of the evidence.

Appellant argues for application of the more stringent test of *Chapman v. California* (1967) 386 U.S. 18, 24, claiming the error violated his rights to due process and a fair trial. Generally, however, "'violations of state evidentiary rules do not rise to the level of federal constitutional error.' [Citation.]" (*People v. Samuels*, supra, 36 Cal. 4th at p. 114.) We see no reason to depart from this principle here.

*Swierski*, 2014 WL 6680126, **18-20 (footnotes in original).

### c.  Analysis

#### 1)  Due Process Claim

To violate due process, the allegedly wrongful admission of evidence must be "so extremely unfair that its admission violates 'fundamental conceptions of justice.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)).

The Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991).  *Estelle v. McGuire* specifically left open the question regarding propensity evidence.  *See id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

When the Supreme Court "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.' Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (alterations in original) (citation

1  omitted) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and 28 U.S.C. § 2254(d)(1)).

2      The Ninth Circuit has recognized that the Supreme Court has never held that the

3  introduction of propensity or other allegedly prejudicial evidence violates due process.  *See Foy v.*

4  *Gipson*, 609 F. App'x 903 (9th Cir. 2015) (no habeas relief on claim that admission of propensity

5  evidence (evidence that defendant assaulted another woman after he assaulted victim in the instant

6  case) violated defendant's right to due process because *Estelle v. McGuire*'s reservation of the

7  question as to whether propensity evidence violates due process "forecloses the conclusion that the

8  state court's decision was contrary to, or an unreasonable application of, clearly established

9  federal law"); *Munoz v. Gonzales*, 596 F. App'x 588 (9th Cir. 2015) (even if admission of

10  evidence of prior auto theft was improperly admitted to show propensity, habeas relief was

11  foreclosed because *Estelle v. McGuire* reserved the question whether propensity evidence violates

12  due process); *Alberni v. McDaniel*, 458 F.3d 860, 865 (9th Cir. 2006) (denying habeas relief on

13  claim that due process was violated by admission of evidence of defendant's past violent actions

14  and explosive temper to show propensity, citing *Estelle v. McGuire's* reservation of the question

15  whether propensity evidence violates due process); *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir.

16  2009) (because balancing test for excluding evidence was creation of Ninth Circuit law and

17  Supreme Court had not directly considered whether trial court's exercise of discretion to exclude

18  evidence violated defendants' constitutional right to present evidence, state court's failure to use

19  Ninth Circuit's balancing test was not contrary to, or an unreasonable application of, clearly

20  established Supreme Court precedent).

21      "[E]valuating whether a rule application was unreasonable requires considering the rule's

22  specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-

23  by-case determinations."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

24      Here, the state appellate court at least tacitly found that the introduction of the letters

25  violated state, but not federal, law.  *Swierski*, 2014 WL 6680126, **19-20.  The state appellate

26  court determined that it would not depart from the principle that "'violations of state evidentiary

27  rules do not rise to a level of federal constitutional error.'"  *Id.* at *20 (quoting *People v. Samuels*,

28  36 Cal. 4th 96, 114 (2005)).  That apparent conclusion that no due process violation could have

*United States District Court*
*Northern District of California*

occurred was reasonable.  As the state appellate court pointed out, "the evidence of [Petitioner's] guilt was overwhelming" and Petitioner "fail[ed] to show a reasonable probability of a more favorable outcome but for the alleged evidentiary error . . . ."  *Id.*  Bearing in mind the general nature of the Supreme Court's articulation of the principle of "fundamental fairness"—i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *Dowling*, 493 U.S. at 352—the state appellate court's rejection of Petitioner's due process claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court.  *See generally Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ") (citation omitted)).

In this circuit, the admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are *no* permissible inferences the jury may draw from the evidence."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

> Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions.  Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial."  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.

*Jammal*, 926 F.2d at 920 (citation and footnote omitted).

The Court finds that permissible inferences could be drawn from the letters.  *See id*.  The letters strongly demonstrated Petitioner's motive and intent to harm his romantic partners, as well as anyone who helped his romantic partners get away from him.  *See* Cal. Evid. Code § 1101(a), (b).  The evidence was relevant to show that Petitioner was similarly motivated by revenge when he killed Reina.  Petitioner had, after all, told Eva that Reina was "cheating" on him and that he would "kill her" if she left him.  *See* 6RT 416, 445-46.

Further, as the state appellate court pointed out, the evidence against Petitioner was

overwhelming. *Swierski*, 2014 WL 6680126, *19.  Petitioner had a motive to kill Reina, since he believed she "may be having an affair."  *See Swierski*, 2014 WL 6680126, *7; *see also* 2CT 412 (jury instruction on motive).  Petitioner repeatedly battered and abused Reina, and he repeatedly threatened to kill her.  *Swierski*, 2014 WL 6680126, **1-3.  Before the killing, Petitioner instructed his daughter Eva to buy a large bag and a shovel, both of which he ultimately used in disposing of Reina's body.  *Id.* at *3.  Petitioner showed Eva the remote, wooded area where he planned to dump Reina's body.  *Id.*  Petitioner admitted to Eva that he choked Reina to death.  *Id.* at *4.  Petitioner never acknowledged having any part in Reina's death, until hikers accidentally stumbled across Reina's body more than three years after Petitioner killed and buried her.  *Id.* There was also abundant evidence of consciousness of guilt—Petitioner was questioned by police over fifteen times following Reina's death and lied to them every time about her whereabouts. 9RT 1009; *see* 9RT 1009-30 (other lies); 2CT 411 (jury instruction on consciousness of guilt— false statements); *Swierski*, 2014 WL 6680126, *7-21.  Petitioner's act of burying Reina's body in a remote location showed additional consciousness of guilt.  *See* 2CT 413 (jury instruction on consciousness of guilt—suppression and fabrication of evidence).  Only after being arrested and charged did Petitioner start to claim that he had been suddenly attacked by Reina and that he killed her in self-defense with a single reflexive punch.  *Swierski*, 2014 WL 6680126, *6.  Thus, the state appellate court was reasonable in concluding that the introduction of the letters did not so infect Petitioner's trial as to amount to a due process violation.

Finally, for the same reasons as above, habeas relief is not warranted because the alleged error of introducing the letters did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *See Brecht*, 507 U.S. at 637.  Therefore, his due process claim is denied.

### 2)  Alternative IAC Claim

Petitioner contends alternatively that his trial counsel rendered ineffective assistance by failing to contemporaneously object to the admission of the letters (People's Exhibits 6, 34, 35 or 43) into evidence.  Dkt. No. 19-3 at 29-32.  Respondent argues that trial counsel "could have reasonably concluded the letters were admissible under federal law, as confirmed by the state

26

court's finding that there was no such error." Dkt. 45-1 at 34.  In any event, the state appellate court rejected this IAC claim upon finding that Petitioner's guilt was "overwhelming" and that he "fail[ed] to show a reasonable probability of a more favorable outcome but for the alleged . . . failure of defense counsel to object to the admission of the evidence."  *Swierski*, 2014 WL 6680126, *19.  Petitioner has made no showing that the state appellate court's denial of this IAC claim was either contrary to or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).  *See id.* at 687 (under *Strickland*, a defendant must show that (1) performance was deficient and that (2) the "deficient performance prejudiced the defense.").  The state appellate court reasonably applied the prejudice prong of *Strickland* in finding no reasonable likelihood of a different result had trial counsel objected to the letters on state or federal constitutional grounds.  *See id.*  Therefore, Petitioner's alternative IAC claim is denied.

Accordingly, Petitioner is not entitled to habeas relief on Claim 2 on either ground asserted.

### 3.   Denial of Right to Present a Complete Defense (Claim 3)

Petitioner contends that the court deprived him "of his Sixth and Fourteenth Amendment right to present a complete defense by threatening to admit inflammatory and prejudicial evidence if he did so." Dkt. No. 19-1 at 1.  In essence, Petitioner contends that his constitutional right to present a complete defense was violated when the trial court precluded him from testifying about Reina's prior violent acts, which would have supported a defense theory that Petitioner was a victim of Intimate Partner Battering.  *Id.* at 27-34.

#### a.  Factual Background

The state appellate court summarized the factual basis for Petitioner's claim as follows:

Pursuant to Evidence Code section 1109,[FN 9] the prosecution moved in limine to introduce evidence that appellant had killed his former girlfriend Hilda Muhammad.[FN 10] According to the prosecutor, on June 25, 1993, "[her] body was pulled from the water in the Basha Kill Wildlife Management Area in Wurstsboro, New York.  She was fully clothed in a purple jump suit with her shoes still on her feet.  Her body was face down or on its side, fifteen feet from shore.  Her body was eight feet from a location where she could stand with her feet touching the ground and her head above the waterline.  She was in an 'angelic' pose with her arms out to [the] side contrary to the more common traumatic position a drowning victim is found.  [¶]  The Basha Kill Wildlife Management Area is a wetland with no current.

27

It is not a place for swimming.  No reported swimming accidents or drowning had been reported in the 15 years prior to Hilda's death.  Hilda was a champion swimmer who swam regularly at a college in Middletown."

[FN 9]: Under Evidence Code section 1101, subdivision (a), "evidence of a person's character or a trait of his or her character," including in the form of "evidence of specific instances of his or her conduct" is "inadmissible when offered to prove his or her conduct on a specified occasion."  However, under Evidence Code section 1109, subdivision (a)(1), "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."  Thus, "[s]ection 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.  [Citation.]' [Citation.]"  (*People v. Brown* (2011) 192 Cal. App. 4th 1222, 1232.)  Murder is a crime of domestic violence for the purposes of Evidence Code section 1109; it is "'the ultimate form of domestic violence.'"  (*People v. Brown*, *supra*, at p. 1237.)  However, evidence of acts occurring more than 10 years before the charged offense is inadmissible under Evidence Code section 1109, subdivision (e), unless the court determines that the admission of the evidence is in the interest of justice.

[FN 10]: There are various spellings of Hilda Muhammad's name in the record.  For consistency we use the spelling that is on the death certificate.

According to the prosecutor, although Muhammad's death was ruled accidental—asphyxia due to drowning—by the Orange County Pathologist, Dr. Michelle Jorden from the Santa Clara County Medical Examiner's office reviewed the autopsy photographs and the investigation report, which cast doubt on that ruling.  According to the prosecutor, Dr. Jorden made the following findings.  "(1) *Florid petechiae* on the face which is consistent with an asphyxia death but very unusual for a drowning.  Superficial abrasions to Hilda's face suggestive of smothering type abrasions.  She also found tongue bite marks which lends support for strangulation; (2) *Blunt Trauma to the Head Otherwise Unexplained*.  The photographs showed temporalis muscle hemorrhage on the right side of the head indicative of blunt trauma to the head; (3) *Hemorrhage around the Cervix/Uterus*.  This finding, in conjunction with the torn clothing around the pelvis area suggests forcible or rough sexual intercourse."  The prosecutor explained that Dr. Jorden would testify that if the Muhammad case had been assigned to her originally and she had performed the autopsy and made these findings, coupled with information she learned through the investigation,[FN 11] she would have concluded that Muhammad's death was a "homicide by asphyxia/strangulation."

[FN 11]: According to the prosecutor, appellant contacted the police and claimed that Muhammad had drowned accidentally.  He explained to the police that he and Muhammad arrived at the Basher Kill Area to go swimming after they had had dinner together at the Red Lobster in Middletown.  He claimed that while he put on his shorts, Muhammad went into the water alone and fully clothed; she swam to the middle of the pond while he stayed near the shore because of an ear infection.  Fifteen minutes later, Muhammad called for help and could not stay afloat.  Appellant told the police he started to swim to her, but became fatigued and began to experience chest pains so he swam back to shore to get an inflatable tube from his vehicle.  Before he could return to the water Muhammad went under.  After calling for her several times, he drove to the police station.  Five days later when he was interviewed

United States District Court
Northern District of California

again, his story changed. This time he told the police that they had eaten dinner at home before going to Red Lobster to eat again. Appellant claimed they had tried to swim in this location on two prior occasions.

The defense moved in limine to exclude all of the evidence surrounding Muhammad's death on Evidence Code section 352 grounds. Counsel argued that it had no relevance to the pending case and any mention of Muhammad's death by the prosecution would prejudice and inflame the jury. The prosecution objected to such exclusion of the evidence by filing a supplemental memorandum of points and authorities.

Ultimately, the court granted defense counsel's motion and excluded the evidence. The court made the following findings: "With respect to [Muhammad], this evidence is outside the window, although not by much, of [Evidence Code section] 1109. Certainly, it's no more inflammatory than the current charges. [¶] I do think it is somewhat remote. And I think that the probability of confusion is great. It will take three to four days to present. [¶] I also think that the degree of certainty of its commission . . . is an issue in this case. The fact that the incident involving Ms. Muhammad did not result in a prosecution, let alone a conviction of the defendant, increases the danger that the jury may wish to punish the defendant for the uncharged offenses and therefore increases the likelihood that the jury will confuse the issues because the jury has to determine whether the uncharged offenses in fact occurred. [¶] So I'm going to find that [Evidence Code section] 352 weighs in favor of exclusion, and I will be excluding that evidence."

During trial, outside the presence of the jury, pursuant to Evidence Code section 1103, subdivision (a), defense counsel proposed to adduce evidence of prior instances of violent behavior by Reina. Specifically, defense counsel proposed to elicit testimony from Crystal—appellant's daughter and Laura's[10] half-sister—that Reina grabbed her by the ears and shook her back and forth after Crystal prepared some food for Laura. Then Reina pulled a telephone out of the wall. Also counsel proposed to elicit testimony from Crystal about an occasion when Reina and appellant were arguing in which Reina threw an orange at appellant and hit him in the back; an incident when during an argument, Reina picked Crystal up by the face and scratched her; and an incident when Reina, appellant and Crystal were in a minivan and Reina slapped appellant with her outstretched arm. Counsel proposed to elicit testimony from Laura that Reina slapped her in the face in 2002; and testimony that Reina hit appellant in the head and shoulders with a day-planner book.

The prosecutor argued that this evidence would open the door to his introducing prior acts of violence by appellant pursuant to Evidence Code section 1103, subdivision (b). The court ruled that as a general matter, there was no question that appellant's prior violent acts were admissible, but the court pointed out that it had already excluded evidence regarding Muhammad's death based on its Evidence Code section 352 analysis. Defense counsel argued that Muhammad's death was not actually evidence of violent conduct, because her death had been ruled an accidental drowning and therefore did not prove that appellant had done anything violent. Counsel argued that evidence of the events surrounding Muhammad's death was covered by Evidence Code section 1103, subdivision (b), only if the preliminary fact that appellant was responsible for Muhammad's death could be

---

[10] Laura is Petitioner's and Reina's daughter.

United States District Court
Northern District of California

established.   Further,   counsel   argued   that   allowing   the   prosecutor   to   inquire   into Muhammad's death would put appellant in the position of having to defend against a case in which he was never charged.  The prosecutor responded that the jury could decide whether Muhammad's death constituted violent conduct by appellant.

In the end, the court ruled that the evidence surrounding Muhammad's death could come in pursuant to Evidence Code section 1103, subdivision (b), if the defense presented evidence of Reina's prior acts of violence pursuant to Evidence Code section 1103, subdivision (a). Based on the court's ruling, defense counsel indicated that she would not be offering any "1103 evidence at this time."

*Swierski*, 2014 WL 6680126, **9-11 (footnote 10 added and other footnotes in original).

### b.  State Court Decision

The state appellate court rejected this claim as follows:

Appellant contends that the court's ruling constituted a "prejudicial abuse of discretion." Appellant argues that the court's ruling prevented him from presenting an "Intimate Partner Battering defense."

At the outset, we note that Evidence Code section 1103, subdivision (a), provides in pertinent part: "In a criminal action, evidence of the character or trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if such evidence is:  [¶]  (1) Offered by the defendant to prove conduct of the victim in conformity  with  the  character  or  trait  of  character."   Evidence  that  Reina  had  violently attacked both appellant and the children would have been admissible under this section to prove that she did have a character trait for violence.  "'It has long been recognized that where self–defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible.' [Citations.]  Under Evidence Code section 1103, such character traits can be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence.  [Citation.]"  (*People v. Wright* (1985) 39 Cal. 3d 576, 587.)  However, in self-defense cases, when a defendant presents evidence of the victim's character for violence, the prosecution may produce rebuttal evidence of the defendant's own character for violence, which may be used to draw propensity inferences. (Evid. Code, § 1103, subd. (b); *People v. Blanco* (1992) 10 Cal. App. 4th 1167, 1173–1175; *People v. Myers* (2007) 148 Cal. App. 4th 546, 552–553.)

We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section 1103.  (See *People v. Davis* (2009) 46 Cal. 4th 539, 602.)  Certainly, the trial court did not abuse its discretion in ruling that the evidence  surrounding  Muhammad's  death  was  admissible.   Although  the  trial  court originally excluded the evidence, it did so in part because she had died in 1993.  Acts occurring more than 10 years prior to the charged offense are presumptively inadmissible pursuant to Evidence Code section 1109, subdivision (e).  Evidence Code section 1103, subdivision (b), which authorizes rebuttal evidence of a defendant's character for violence, contains no comparable restriction.

30

Appellant argues that the trial court's reasons for excluding the evidence concerning Muhammad's death pursuant to Evidence Code "section 352 were no less valid on account of the evidence being offered in response to evidence of Reina's character for violence."

Appellant had "a choice as to presenting evidence of the victim's character, which is similar to many tactical choices at trial—such as deciding whether to testify, or whether to present direct evidence of his own good character.  The defense choice of strategy often makes admissible in rebuttal certain evidence which would not be admissible in the prosecution's case-in-chief."  (*People v. Blanco*, *supra*, 10 Cal. App. 4th at p. 1176.)

Appellant argues that the "apparent reason for the court's change of heart is that the defense was seeking to introduce evidence which would have supported a defense theory based on appellant being a victim of Intimate Partner Battering ('IPB'), and the court wanted to prevent the defense from doing so."  We find appellate counsel's position concerning the trial court's "apparent reason" for its ruling to be both inappropriate and offensive.  We point out that there "is a presumption in the honesty and integrity of our judicial officers."  (*People v. Hernandez* (1984) 160 Cal. App. 3d. 725, 746.)

Furthermore, as appellant concedes, the prosecutor addressed the trial court's concern that evidence of Muhammad's death would take several days.  The prosecutor assured the court that the only additional witness necessary to establish that Muhammad was murdered by appellant was the coroner.  The trial court considered the prosecutor's representations and found that the probative value of the disputed evidence outweighed any prejudice and undue consumption of time.

Appellant complains that defense counsel was faced with an unpalatable choice between exposing him to the increased danger posed by the prosecutor's rebuttal evidence and abandoning evidence that would have supported his defense.  He asserts that defense counsel should not have been forced to make this choice and thus, the trial court's ruling violated his constitutional right to present a complete defense.

As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's constitutional right to present a defense.  (*People v. Cudjo* (1993) 6 Cal. 4th 585, 611.)  "Some rights are mutually exclusive.  For example, a criminal defendant has a right to remain silent and a right to testify on his own behalf.  He cannot do both, and hard choices are not unconstitutional."  (*People v. Frye* (1998) 18 Cal. 4th 894, 940, overruled on other grounds by *People v. Doolin* (2009) 45 Cal. 4th 390, 421, fn. 22.)  Moreover, "[t]he right to present a defense . . . does not include the right to present evidence free from rebuttal . . . ."  (*People v. Carpenter* (1999) 21 Cal. 4th 1016, 1062.)

In sum, the trial court did not prevent appellant from presenting a defense; it was appellant's choice not to introduce the evidence of Reina's violence.  Appellant's argument ignores the express terms of Evidence Code section 1103, subdivision (b).

*Swierski*, 2014 WL 6680126, **11-12 (footnotes in original).

31

### c.   Analysis

The constitutional right to present a complete defense includes the right to present evidence, including the testimony of witnesses. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). But the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." *Id*. at 16.  Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks omitted); *Michigan v. Lucas*, 500 U.S. 145, 151 (1991).  This is true even if the rule under which it is excluded is "respected[,] . . . frequently applied," and otherwise constitutional. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  If the "mechanical" application of such a rule would "defeat the ends of justice," then the rule must yield to those ends.  *Id*.  Still, "[o]nly rarely" has the Supreme Court held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citing *Holmes*, 547 U.S. at 331) (rule did not rationally serve any discernable purpose); *Rock v. Arkansas*, 483 U.S. 44, 61 (1987) (rule arbitrary); *Chambers*, 410 U.S. at 302-03 (state did not even attempt to explain the reason for its rule).

As mentioned above, Petitioner claims his right to a complete defense was violated when the trial court prevented him from introducing evidence of Reina's alleged prior acts of violence, which Petitioner claims would have supported the defense theory based on him being a victim of Intimate Partner Battering. Dkt. No. 19-1 at 27-34.

In the answer, Respondent reiterates that Petitioner "was not denied the right to present evidence or a defense." Dkt. No. 45-1 at 41.  Respondent stresses that contrary to Petitioner's claim that he was prevented from presenting an Intimate Partner Battering defense, the record shows that Petitioner "requested and was granted permission to present evidence of Reina's alleged prior violence." *Id.* (citing *Swierski*, 2014 WL 6680126, *11).  The state appellate court noted that California Evidence Code § 1103 allowed such prior bad acts evidence relating to the victim if was "[o]ffered by the defendant to prove conduct of the victim in conformity with the

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

character or trait of character." *Swierski*, 2014 WL 6680126, *11.  The state appellate court agreed that such evidence was admissible, stating that "[e]vidence that Reina had violently attacked both appellant and the children would have been admissible under this section to prove that she did have a character trait for violence." *Id.*  However, the state appellate court further clarified that "in self-defense cases, when a defendant presents evidence of the victim's character for violence, the prosecution may produce rebuttal evidence of the defendant's own character for violence, which may be used to draw propensity inferences." *Id.* (citing Cal. Evid. Code § 1103). The specific rebuttal evidence at issue was the evidence surrounding Muhammad's death, which the trial court found admissible if it came in pursuant to California Evidence Code § 1103(b) after Petitioner had presented Reina's prior acts of violence pursuant to California Evidence Code § 1103(a).  *Swierski*, 2014 WL 6680126, *11.  Thus, as Respondent pointed out, while Petitioner's argument is unclear, it seems that he is either contending that "his rights were violated because his right to introduce evidence should have been unfettered by the prospect of rebuttal evidence per se," or that "his rights were violated because the rebuttal evidence was simply inadmissible."  Dkt. No. 45-1 at 42.  Respondent argues that both complaints fail.  *See id.* at 42-45.  This Court agrees and finds that the state appellate court's rejection of this claim was reasonable because Petitioner's proposed evidence was not in fact excluded, but even assuming it was, such exclusion would not have been contrary to or an unreasonable application of Supreme Court law.

The Supreme Court has made clear that "'[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions,' such as evidentiary and procedural rules."  *See Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  In *Moses v. Payne*, the Ninth Circuit noted that the Supreme Court had not specifically addressed whether a state evidentiary rule that led to the preclusion of evidence could lead to a violation of a defendant's right to present a defense.  *See* 555 F.3d at 756, 758-59.  While *Moses* dealt with a state evidence rule regarding expert testimony, Petitioner has not identified any Supreme Court authority specifically on point for the facts of this case.  Thus, to the extent Petitioner contends that a state evidentiary rule, such as California Evidence Code § 1103(b), led the trial court to make certain rulings that *denied* him the ability to present a

United States District Court
Northern District of California

defense, he lacks "clearly established Federal law" to support his complaint.  *See* 28 U.S.C.

§ 2254(d)(1).  Because the Supreme Court has not squarely addressed the issue whether a trial

court's exercise of its discretion in this context violates a defendant's constitutional right to

present a defense, Petitioner is not entitled to federal habeas relief.  *Moses*, 555 F.3d at 758-60.

If, alternatively, Petitioner contends that his right to "a meaningful opportunity to present a

complete defense" includes the right not to face prosecution evidence rebutting the defense

evidence, his claim fails again for lack of supporting authority, because no Supreme Court holding

supports such a position.  *See United States v. Alvirez*, 831 F.3d 1115, 1124-25 (9th Cir. 2016)

(holding that trial counsel's election not to introduce certain evidence because, according to trial

court, it would open the door to otherwise inadmissible adverse prosecution evidence, did not

deny defendant's right to present a defense); *United States v. Kessinger*, 641 F. App'x 500, 503

(6th Cir. 2016) (rejecting claim that permitting prosecutor to introduce rebuttal evidence violated

right to present defense, and noting, "Kessinger points to no rule, and no rule can be found, that

allows a defendant to preempt a prosecutor's right to present rebuttal evidence.").  The state

appellate court pointed out that Evidence Code section 1103 is recognized as long-standing rule of

evidence, explaining that:

> "'It has long been recognized that where self-defense is raised in a homicide case, evidence
> of the aggressive and violent character of the victim is admissible.'  [Citations.]  Under
> Evidence Code section 1103, such character traits can be shown by evidence of specific acts
> of the victim on third persons as well as by general reputation evidence.  [Citation.]"  . . .
> However, in self-defense cases, when a defendant presents evidence of the victim's character
> for violence, the prosecution may produce rebuttal evidence of the defendant's own character
> for violence, which may be used to draw propensity inferences.

*Swierski*, 2014 WL 6680126, *11 (internal citations omitted).  That Petitioner's evidence

concerning Reina's alleged character for violence was subject to rebuttal evidence regarding

Petitioner's character for violence did not implicate any "clearly established Federal law."  28

U.S.C. § 2254(d)(1).

The Court also finds reasonable the state appellate court's rejection of Petitioner's

assertion that defense counsel should not have been forced to make "an unpalatable choice

between exposing him to the increased danger posed by the prosecutor's rebuttal evidence and

United States District Court
Northern District of California

abandoning evidence that would have supported his defense." *Swierski*, 2014 WL 6680126, *12. The state appellate court reasonably concluded, as this Court has already discussed above, that "ordinary rules of evidence do not impermissibly infringe on the accused's constitutional right to present a defense," and, moreover, "[t]he right to present a defense . . . does not include the right to present evidence free from rebuttal . . . ." *Id.* (citations omitted).  Defendants face a variety of difficult decisions during trial concerning the introduction of evidence and its potential consequences.  *See, e.g.*, *Wong v. Belmontes*, 558 U.S. 15, 20, 22 (2009) (per curiam) (habeas court must consider "*all* the relevant evidence that the jury would have had before it if [counsel] had pursued the different path," and it is reasonable for counsel to limit introduction of evidence that would assist the prosecution); *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) ("Any attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions."); *Williams v. Florida*, 399 U.S. 78, 83-84 (1970) ("The defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction.  When he presents his witnesses, he must reveal their identity and submit them to cross-examination which in itself may prove incriminating or which may furnish the State with leads to incriminating rebuttal evidence.")  Here, Petitioner has not pointed to any Supreme Court holding suggesting that such difficult strategic decisions by themselves infringe a defendant's right to present a defense.

Finally, to the extent that Petitioner contends that the rebuttal evidence—that Muhammad was murdered—was inadmissible, his claim still fails.  As the state appellate court pointed out:

> Appellant had "a choice as to presenting evidence of the victim's character, which is similar to many tactical choices at trial—such as deciding whether to testify, or whether to present direct evidence of his own good character.  The defense choice of strategy often makes admissible in rebuttal certain evidence which would not be admissible in the prosecution's case-in-chief."

*Swierski*, 2014 WL 6680126, *12.  The state appellate court reasonably determined that "the trial court did not abuse its discretion in ruling that the evidence surrounding Muhammad's death was admissible" and relevant to show Petitioner's character for violence.  *See id.* at *11; *see also* Cal. Evid. Code § 1103(a)(2), (b).

35

Even assuming, *arguendo*, error in the trial court's ruling under California Evidence Code § 1103, any such error did not have a substantial and injurious effect or influence in determining the jury's verdict, for the same reasons detailed above in the discussion of the claimed due process error.  *See supra* Section III.B.2.c.(1).

Accordingly, the state appellate court's rejection of this claim was not "contrary to," or "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).  Therefore, Petitioner is not entitled to the writ on Claim 3.

### 4. Admission of Evidence of Prior Uncharged Acts of Domestic Violence (Claim 4)

Petitioner argues that evidence of prior uncharged acts of domestic violence was erroneously admitted, thereby violating his due process rights and rendering his trial fundamentally unfair.  Dkt. No. 19-1 at 50-57.

### a. State Court Decision

The state appellate court described the factual background for this claim and rejected it as follows:

> Appellant contends that the court abused its discretion and violated his rights to due process under the federal Constitution by admitting prejudicial and inflammatory evidence, which served no purpose other than to arouse the jury's passions and prejudices.
>
> Specifically, appellant challenges the admission of evidence of his prior acts of domestic violence against Casinillo because they were remote in time and not similar to the charged offense; admission of testimony by three different witnesses mentioning Muhammad's death;[FN 12] and admission of testimony by Arellano that she suffered "consequences" every time she helped Reina.
>
> [FN 12]: Arellano, Molina, and Mattman all testified that Reina feared for her life because appellant had told her that he had killed a former wife.
>
> Even if the trial court abused its discretion in admitting this evidence, we would find any such assumed error harmless.  The application of the ordinary rules of evidence such as Evidence Code section 352 does not implicate the federal Constitution.  Thus, we review allegations of error under the reasonable probability standard of *People v. Watson* (1956) 46 Cal. 2d 818, 836 (*Watson*).  (*People v. Marks* (2003) 31 Cal. 4th 197, 226–227.)  The "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." (*People v. Brown* (2003) 31 Cal. 4th 518, 545.)  Under the *Watson* standard, the erroneous admission of evidence does not compel reversal unless a result more favorable to the

defendant would have been reasonably probable if such evidence had been excluded. (*People v. Fuiava* (2012) 53 Cal. 4th 622, 671 [applying the *Watson* standard to the erroneous admission of evidence].)

Here, the evidence of appellant's guilt was overwhelming.  It is undisputed that appellant killed Reina; he so admitted during his testimony.  However, the testimony from Eva that appellant instructed her to buy a shovel and a bag before the killing and even took her to a wooded area where he planned to dump Reina's body was powerful evidence that he planned Reina's murder.  He admitted to Eva that he choked Reina to death.  This evidence, coupled with evidence that he repeatedly battered and abused Reina and threatened to kill her, convinces this court that there is no reasonable probability that the result of the trial would have been more favorable to appellant without the allegedly erroneously admitted evidence.

*Swierski*, 2014 WL 6680126, **12-13 (footnotes in original).

### b.  Analysis

After carefully reviewing the record, the Court concludes that the state appellate court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  A federal writ of habeas corpus will not be granted for an erroneous admission of evidence unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).  As mentioned above, the admission of evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal*, 926 F.2d at 920.  Evidence must "be of such quality as necessarily prevents a fair trial" for its admission to violate due process.  *Id.* (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)).  Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley*, 568 F.3d at 1101 (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).  Therefore, "under AEDPA, even

United States District Court
Northern District of California

clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court."  *Id.*  In addition, as the Court has noted above, the Supreme Court has left open the question of whether admission of propensity evidence violates due process. *Estelle*, 502 U.S. at 75 n.5; *see also Alberni*, 458 F.3d at 866–67) (recognizing that the Supreme Court has expressly concluded that whether a petitioner's due process right is violated by the admission of propensity evidence is an "open question").  Pursuant to these binding authorities, the state appellate court's rejection of Petitioner's due process claim here does not support the granting of federal habeas relief under AEDPA because a California trial court's admission of evidence under California Evidence Code § 1109[11] to show propensity does not violate any principle of clearly established federal law.  *Holley*, 568 F.3d at 1101.

Next, Petitioner has not shown that the state appellate court's decision to admit into evidence his prior uncharged acts of domestic violence was objectively unreasonable.  A state court's determination of state law is binding on this Court.  *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988).  Moreover, any prejudicial effect flowing from this evidence was ameliorated by the limiting instructions read to the jury.  For example, Diane Arellano testified that Petitioner "told [Reina] that she would never leave him and that if she tried, that he would kill her, like his first wife."  5RT 247.  Defense counsel objected, and the trial court instructed the jury that the testimony was "not to be taken for any truth contained in the statement but just for the effect on the hearer."  5RT 247.  Similarly, Claudia Molina testified that Reina "said she feared for her life because [Petitioner] had murdered his first wife."  5RT 305.  Again, defense counsel objected, and the trial court instructed the jury, "You are not to take that statement for any truth contained in it that the defendant murdered his first wife but for a reason to explain now she was fearful."  5RT 305.  Finally, Ted Mattman testified that Reina "said that [Petitioner] had been married in the past and that something bad had happened to that person."  6RT 356.  The prosecutor asked if Mattman

---

[11] In any case involving domestic violence, California Evidence Code § 1109(a)(1) permits the introduction of evidence of prior acts of domestic violence to show the defendant's propensity to commit such acts.  *See* Cal. Evid. Code §§ 1101, 1109(a)(1).

had "in fact [told officers] that Reina had told you that he had been married two times prior and that the second wife ended up dead?"  6RT 356-57.  Mattman replied, "Yes."  6RT 357.  Defense counsel objected, and the trial court instructed the jury that Reina's statement was only being offered to demonstrate her fear.  6RT 357.  The Court presumes that the jury followed its instructions and used the evidence appropriately.  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

Ultimately, the state appellate court concluded that even if the trial court abused its discretion in admitting this evidence, such error was harmless in light of the overwhelming evidence of Petitioner's guilt including: evidence that Petitioner repeatedly battered and abused Reina and threatened to kill her; Petitioner's admission during his testimony that he killed Reina and evidence that he admitted to Eva that he choked Reina to death; and testimony from Eva that Petitioner planned the murder because he instructed her to buy a shovel and bag before the killing and showed her the wooded area where he planned to dump the body.  *Swierski*, 2014 WL 6680126, *13.  In finding harmless error, the state appellate court implicitly found no due process violation.  *See Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir. 2000) ("[the harmless error] standard under California state law is the equivalent of the *Brecht* standard under federal law, to wit, whether the errors had a "'substantial and injurious effect or influence in determining the jury's verdict'") (citation omitted).

Accordingly, the Court finds that the state appellate court's rejection of this claim based on the allegedly erroneous admission of prior uncharged acts of domestic violence was neither contrary to nor involved an unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  Therefore, Petitioner is not entitled to habeas relief on Claim 4.

### 5. Failure to Instruct on Imperfect Self-Defense Theory of Voluntary Manslaughter (Claim 5)

Petitioner contends his rights to due process and a fair trial were violated because the trial court did not instruct the jury, *sua sponte*, on an "imperfect self-defense" theory of voluntary manslaughter.  Dkt. No. 19-1 at 58-69.

### a. State Court Decision

The state appellate court gave the following background and rejected Petitioner's

instructional error argument relating to imperfect self-defense:

> Appellant was charged with murder.  In addition to the instructions on murder, the court instructed the jury on voluntary manslaughter—heat of passion.  However, the court did not instruct on imperfect self-defense voluntary manslaughter.[FN 15]

> [FN 15]: In addition, the court instructed the jury on justifiable homicide—a killing in self-defense; excusable homicide—accident; and excusable homicide—accident in the heat of passion.

> Appellant contends that his Fifth, Sixth and Fourteenth Amendment rights to due process and a fair trial were violated by failing to instruct on imperfect self-defense voluntary manslaughter.

> Assuming for the sake of argument that the trial court was required to give an instruction on imperfect self-defense voluntary manslaughter, an error in failing to instruct on a lesser included offense does not warrant reversal unless an examination of the entire cause, including the evidence, discloses that "it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred.  [Citation.]"  (*People v. Breverman* (1998) 19 Cal. 4th 142, 149; see *Watson*, *supra*, 46 Cal. 2d at p. 836.)

> "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions."  (*People v. Koontz* (2002) 27 Cal. 4th 1041, 1085–1086.)  Thus, the failure to give a lesser included offense instruction is often harmless where the jury is given other reasonable lesser offense options but rejects those options in favor of the charged offense.  In such cases, the jury is not "forced [into] 'an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.'"  (*People v. Lacefield* (2007) 157 Cal. App. 4th 249, 262 (*Lacefield*), disapproved on other grounds in *People v. Smith* (2013) 57 Cal. 4th 232, 242; *see People v. Dominguez* (1992) 11 Cal. App. 4th 1342, 1353 [defendant charged with robbery; failure to instruct on lesser included offense of grand theft was harmless because jury was instructed on lesser included offense of petty theft and was thus not put to an unwarranted all-or-nothing choice]; cf. *People v. Lipscomb* (1993) 17 Cal. App. 4th 564, 571 [defendant charged with assault with a firearm and failure to instruct on lesser related offense of brandishing was harmless where the jury was not faced with an all-or-nothing choice because it was instructed on other lesser related offenses].)

> In the context of a murder case, as our Supreme Court explained in *People v. Rogers* (2006) 39 Cal. 4th 826, any error in failing to give an instruction on a lesser included offense was harmless because, as here, the jury had rejected the lesser options of second degree murder and heat of passion voluntary manslaughter.  (*Id.* at p. 884; *see also People v. Barnett* (1998) 17 Cal. 4th 1044, 1156 [failure to give involuntary manslaughter instruction harmless where jury found defendant guilty of first degree murder in the face of exhaustive instructions pertaining to the lesser included offenses of second degree murder and voluntary manslaughter; the jury reached the factual conclusion that defendant acted with malice aforethought, deliberation, and premeditation].)

United States District Court
Northern District of California

1    *Swierski*, 2014 WL 6680126, \*20 (footnotes in original).

2                              **b.  Analysis**

3         A state trial court's refusal to give an instruction does not alone raise a ground cognizable

4    in federal habeas corpus proceedings.  *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).

5    The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the

6    Fourteenth Amendment.  *Id.*

7         Although instructions on lesser-included offenses must be given in capital cases, *Beck v.*

8    *Alabama*, 447 U.S. 625 (1980), "[t]here is no settled rule of law on whether *Beck* applies to

9    noncapital cases such as the present one.  In fact, [the Ninth Circuit], without specifically

10   addressing the issue of extending *Beck*, has declined to find constitutional error arising from the

11   failure to instruct on a lesser included offense in a noncapital case."  *Turner v. Marshall*, 63 F.3d

12   807, 819 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th

13   Cir. 1999) (en banc).  The failure of a state trial court to instruct on lesser-included offenses in a

14   non-capital case does not present a federal constitutional claim.  *Solis v. Garcia*, 219 F.3d 922,

15   929 (9th Cir. 2000); *see also Windham v. Merkle*, 163 F.3d 1092, 1105-06 (9th Cir. 1998).

16        Under Ninth Circuit precedent, "the defendant's right to adequate jury instructions on his

17   or her theory of the case might, in some cases, constitute an exception to the general rule."  *Solis*,

18   219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  *Solis* suggests that

19   substantial evidence must exist to warrant instruction on the lesser included offense.  *Id.* at 929-30

20   (no duty to instruct on voluntary manslaughter as lesser included offense to murder because

21   evidence presented at trial precluded heat of passion or imperfect self-defense instruction; no duty

22   to instruct on involuntary manslaughter because evidence presented at trial implied malice).  As

23   discussed above, Petitioner was charged with murder, and the jury was instructed on both first and

24   second degree murder.  2CT 426-29.  The jury was also instructed on voluntary manslaughter

25   under a heat-of-passion theory.  2CT 431-32.  *Swierski*, 2014 WL 6680126, \*20.  As for

26   "defenses," in addition to heat of passion, the jury was instructed on true, or "reasonable," self-

27   defense (2CT 418-19), excusable homicide by "accident" (2CT 420), excusable homicide by

28   accident in the heat of passion (2CT 421-22), and provocation (2CT 430).  However, as

United States District Court
Northern District of California

41

United States District Court
Northern District of California

1    mentioned, Petitioner claims that the trial court erred in failing to instruct on imperfect self-

2    defense voluntary manslaughter.  Under California law, when a defendant kills in the actual but

3    unreasonable belief that he or she is in imminent danger of death or great bodily injury, the

4    doctrine of "imperfect," or "unreasonable," self-defense applies to reduce the killing from murder

5    to voluntary manslaughter. *See People v. Michaels*, 28 Cal. 4th 486, 529 (2002); *In re Christian

6    S.*, 7 Cal. 4th 768, 771, 773 (1994). "Imperfect self-defense applies where the defendant actually

7    believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and

8    actually believes the acts which cause the victim's death are necessary to avert the threat, but these

9    beliefs are objectively unreasonable." *People v. Curtis*, 30 Cal. App. 4th 1337, 1354 (1994).

10          Petitioner's claim fails because there is no clearly established federal rule that a trial court

11   must instruct on all lesser-related and lesser-included offenses. *See Solis*, 219 F.3d at 929.

12   Petitioner is entitled to relief only if he can demonstrate that the failure to instruct on the lesser-

13   included offense of imperfect self-defense voluntary manslaughter violated due process.

14          Here, the state appellate court assumed "for the sake of argument" that the trial court was

15   required to give an instruction on the lesser-included offense of imperfect self-defense voluntary

16   manslaughter, but found any such error harmless because "the jury had rejected the lesser options

17   of second degree murder and heat of passion voluntary manslaughter."  Swierski, 2014 WL

18   6680126, *20.  This finding was not an unreasonable application of Supreme Court authority.  As

19   the state appellate court noted, in considering the issues of whether Petitioner formed the intent to

20   kill and whether he acted with premeditation and deliberation, the jury was instructed that it could

21   consider second degree murder and heat of passion voluntary manslaughter. *See id*.  Having been

22   so instructed, the jury found that Petitioner possessed those mental states when he killed Reina—

23   convicting him of first degree murder.  Thus, the Court finds that the absence of the imperfect self-

24   defense voluntary manslaughter instruction did not "so infect[] the entire trial that the resulting

25   conviction violates due process.'" *Estelle*, 502 U.S. at 72.

26          Finally, in making the determination that an alleged error has no substantial and injurious

27   effect on the verdict, the Court should consider the strength of the prosecution's evidence.  As

28   discussed above, overwhelming evidence of Petitioner's guilt of murder was presented, and

evidence of imperfect self-defense was lacking.  *See supra* Sections III.B.2.c.(1), III.B.4.b.  Thus, the jury's affirmative finding that Petitioner acted with malice aforethought and committed the premeditated and deliberate killing of Reina effectively foreclosed the possibility of a successful imperfect self-defense claim.  *See* 2CT 428-29, 441.  Based on the foregoing, the state appellate court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to the writ on Claim 5.

### 6.    IAC Claims (Claim 10)

Petitioner claims he was deprived of effective assistance of his trial counsel based on the failure to object to (a) coroner Dr. Jorden's testimony and (b) two instances of prosecutorial misconduct by the Deputy District Attorney.  Dkt. No. 19-3 at 53-55.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel.  *Strickland*, 466 U.S. at 686.  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*  In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687–88.  Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the *Strickland* test "if the petitioner cannot even establish incompetence under the first prong."  *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).  Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice

43

suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

"The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.  In other words, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Griffin v. Harrington*, 727 F.3d 940, 945 (9th Cir. 2013)) (quoting *Harrington*, 562 U.S. at 101).

### a.  Failure to Object to Dr. Jorden's Testimony

#### 1)  State Court Decision

The state appellate court gave the following background and then rejected this IAC claim involving trial counsel's failure to object to Dr. Jorden's testimony as follows:

> At trial, Dr. Jorden, an assistant medical examiner and neuropathologist, testified generally about the mechanics of strangulation and its effects on the human body. Dr. Jorden explained that unconsciousness results after 10 to 20 seconds of pressure sufficient to cut off the flow of blood to the carotid artery. Alternatively, if the trachea is compressed the victim is prevented from breathing. Dr. Jorden conceded that she had never examined Reina's body because Reina's body had not been found.

> Before trial, defense counsel moved the court to rule that Dr. Jorden could not testify on the ground that Dr. Jorden's testimony was not relevant because there was no cause of death in this case. The court found that the testimony was relevant to "corroborate what Eva's saying . . . ." Defense counsel persisted, explaining that the cause of death in this case was disputed and there was no medical evidence of cause of death. Defense counsel protested that she was not certain of the "parameters" of Dr. Jorden's testimony, though the prosecutor had advised her that Dr. Jorden would testify about "[s]trangulation in general." The court told defense counsel that she had her answer; and that Dr. Jorden was going to testify "how people die from strangulation and . . . how . . . their breathing gets shut down and how long it takes and what kind of pressure there has to be and would you do that to someone and not know that they had died. [¶] I mean, I'm sitting here, and I'm telling you what . . . [the prosecutor]'s shaking his head. So that's what I'm assuming we're going to hear. So I don't find that there's anything improper in his explanation to you or that you require any additional information from him."

> Defense counsel reiterated that she was objecting to Dr. Jorden testifying because "there's no indication of what exactly she's going to testify to that's relevant in general to this case if there's no cause of death determination. [¶] I guess what I also want to put on the record is that she cannot, without some kind of evidence, refer to this case as a strangulation case because she hasn't determined the cause of death. And I don't think that—" The court interrupted defense counsel to say that if counsel heard Dr. Jorden do that she should object, but that the court did not feel that the court needed to rule until the witness testified. The court continued, "Once we get the witness on the stand, if you feel that the witness is

testifying to things that are inappropriate, please approach, and we'll deal with it. But for right now, I don't believe, based on what I can foresee, that there are going to be any . . . real issues here." Defense counsel asked the court if her objection was noted for the record.

Appellant complains that counsel "never objected to Jorden's testimony on the basis that its limited probative value was outweighed by a very real possibility of confusing or misleading the jury."

The court made it quite apparent that the court found the proposed testimony by Dr. Jordan to be entirely proper because Dr. Jorden's testimony would be restricted to describing the mechanics of strangulation. Defense counsel could reasonably have determined that the court's relevancy determination encompassed an Evidence Code section 352 analysis and any further objection by defense counsel would have been futile. "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal. 4th 324, 387.) Furthermore, counsel could have recognized that Dr. Jorden's testimony would not be unduly prejudicial in that it did not tend uniquely to evoke an emotional bias against appellant as an individual while having very little effect on the issues because there was no cause of death determination by Dr. Jorden. In addition, counsel could reasonably have believed that her relevancy objection was the strongest ground for exclusion and made a tactical decision to focus on that ground.

More importantly, "competent counsel may often choose to forgo even a valid objection." (*People v. Riel* (2000) 22 Cal. 4th 1153, 1197.) It appears that counsel made a tactical decision to use Dr. Jorden's testimony to appellant's advantage. In this case, defense counsel established on cross-examination that in cases of manual strangulation, generally, the hyoid bone is fractured. This, coupled with Zephro's testimony that Reina's hyoid bone was not fractured, supported the defense theory that appellant did not strangle Reina. "'Matters involving trial tactics are matters "as to which we will not ordinarily exercise judicial hindsight . . . ." [Citation.] "In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel . . . ." [Citations.] . . . "The choice of when to object or not is inherently a matter of trial tactics not ordinarily reviewable on appeal; failure to object does not necessarily indicate incompetence . . . ."' [Citations.]" (*People v. Frierson* (1979) 25 Cal. 3d 142, 158.)

Appellant complains that defense counsel did not request and the court did not give an admonition to the jury that they were not to consider Dr. Jorden's testimony as evidence that Reina was in fact strangled. He asserts that in the absence of such an admonition "it is impossible to imagine that the jury did not do precisely that." Appellant's theory that in the absence of an admonition the jury would have used Dr. Jorden's testimony as evidence that Reina was in fact strangled depends upon a highly speculative and improbable chain of events. First, the jury would have to have ignored Dr. Jorden's testimony that she never examined Reina's body, that she never determined a cause of death, and that she "didn't write a report regarding Reina Swierski at all." Defense counsel was not required to request an admonition in light of this testimony.

In sum, on the issue of defense counsel's failure to object to the testimony of Dr. Jorden on Evidence Code section 352 grounds, appellant has not overcome the "strong presumption

45

that counsel's conduct falls within the wide range of reasonable professional assistance" (*Strickland*, *supra*, 466 U.S. at p. 689) and shown deficient performance under the first prong of *Strickland* (*id.* at p. 687).

*Swierski*, 2014 WL 6680126, **14-15.

### 2) Analysis

Petitioner contends that his defense counsel "never objected to [Dr.] Jorden's testimony on the basis that its limited probative value was outweighed by a very real possibility of confusing or misleading the jury." Dkt. No. 19-3 at 54. First, as shown above, this contention is meritless because defense counsel objected at length to Dr. Jorden's testimony. *See Swierski*, 2014 WL 6680126, *14. The state appellate court determined that "[d]efense counsel could reasonably have determined that the court's relevance determination encompassed an Evidence Code section 352, and that further objection would be redundant and futile." *Id.*; *see also* Dkt. No. 1-5 at 70 (trial counsel declaration). Further, the state appellate court pointed out that the trial court indicated that it found the proposed testimony to be "entirely proper because Dr. Jorden's testimony would be restricted to describing the mechanics of strangulation." *See Swierski*, 2014 WL 6680126, *14. In her declaration, trial counsel confirms that she believed any further objections would be futile, stating as follows:

> I did not object to Dr. Jorden's testimony about strangulation pursuant to Evidence Code section 352 because I believed that the court's analysis encompassed the section 352 analysis. That is, I believed that the court's ruling on my objection implicitly held that the probative value of Dr. Jorden's testimony outweighed its potential for undue prejudice.

Dkt. No. 1-5 at 70 (trial counsel declaration). As such, trial counsel cannot be ineffective for failing to make a futile objection. *See Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("Counsel is not necessarily ineffective for failing to raise even a nonfrivolous claim, so clearly we cannot hold counsel ineffective for failing to raise a claim that is meritless." (citation omitted)).

Petitioner further contends that "defense counsel did not request, and the court did not give, an admonition to the jury that they were not to consider [Dr.] Jorden's testimony as evidence that Reina was, in fact, strangled." Dkt. No. 19-3 at 54 (brackets added). He asserts that in "the absence of such an admonition, it is impossible to imagine that the jury did not do precisely that." *Id.* The Court finds Petitioner's argument unavailing because no basis exists for this supposition.

United States District Court
Northern District of California

46

1    During cross-examination, Dr. Jorden expressly acknowledged that she never examined Reina's

2    body, that she never determined a cause of death, and that she "didn't write a report regarding

3    Reina Swierski at all."  8RT 829.  In light of such testimony, defense counsel had no reason to

4    request an admonition.  In sum, the state appellate court reasonably applied *Strickland* when it

5    concluded that, concerning defense counsel's asserted failure to object to Dr. Jorden's testimony

6    on section 352 grounds, Petitioner "ha[d] not overcome the 'strong presumption that counsel's

7    conduct falls within the wide range of reasonable professional assistance' . . . and shown deficient

8    performance under the first prong of *Strickland*."  *See Swierski*, 2014 WL 6680126, *15 (citing

9    *Strickland*, 466 U.S. at 687, 689).

10    Petitioner also fails to establish that, absent Dr. Jorden's testimony, there is a reasonable

11    probability he would have achieved a different outcome at trial.  *See Strickland*, 466 U.S. at 687-

12    88.  The impact of Dr. Jorden's testimony was minimal in light of her acknowledgment that she

13    did not examine Reina's body.  *See Swierski*, 2014 WL 6680126, *14.  Further, as the state

14    appellate court pointed out, trial counsel "made a tactical decision to use Dr. Jorden's testimony to

15    [Petitioner]'s advantage," pointing out that Reina's hyoid bone was not fractured, which supported

16    Petitioner's theory that Petitioner did not strangle Reina.  *See id.* at *15.  In any event, as

17    discussed above, the evidence of Petitioner's guilt was overwhelming, *see supra* Section

18    III.B.2.c.(1), and thus no prejudice resulted from defense counsel's alleged failure to object to Dr.

19    Jorden's testimony.  Accordingly, habeas relief is denied for this IAC claim.

20    **b.  Failure to Object to Prosecutorial Misconduct**

21    Next, Petitioner contends trial counsel was ineffective for failing to object to two instances

22    of alleged prosecutorial misconduct during rebuttal argument: (1) the prosecutor misstated the law

23    in a manner that impermissibly reduced or shifted the burden of proving elements of the charged

24    offenses, Dkt. No. 19-3 at 55-58; and (2) the prosecutor vouched for Eva and argued facts that

25    were not in evidence, Dkt. No. 19-3 at 1.

26    The appropriate standard of review for a prosecutorial misconduct claim in a federal

27    habeas corpus action is the narrow lens of due process rather than the broad exercise of

28    supervisory power.  *Darden*, 477 U.S. at 181.  A defendant's due process rights are violated when

a prosecutor's comments render a trial fundamentally unfair.  *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.")  Under *Darden,* the inquiry is whether the prosecutor's remarks were improper and, if so, whether the comments infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

### 1)  Alleged Misstatement of the Law

#### i.    State Court Decision

The state appellate court gave the following background and then rejected this IAC claim involving defense counsel's failure to object to the prosecutor's alleged misstatement of the law during closing argument, as follows:

> In response to defense counsel's argument that if the jury thought that it was possible there was an attack by Reina with the backscratcher knife the jury should vote not guilty, the prosecutor responded, "[T]hat could not be further from the truth. That is 100 percent false. The law is I have to prove to you the truth of the charge beyond a reasonable doubt. And a 'reasonable doubt' is defined as follows: 'It is not a mere possible or imaginary doubt because everything relating to human affairs is open to some possible or imaginary doubt.' That is the legal language." Appellant concedes that this was a correct description of the prosecutor's burden of proof, but asserts that immediately thereafter the prosecutor contradicted that point by stating the following: "What that means is, if you're back in the jury room and someone says 'Well, it is possible, you know, that . . . maybe he caught her on the phone that day, and they had an argument, and then this happened. Maybe that's possible,' other jurors should, please, say, 'Time out,' right there. [¶] *First of all, there's no evidence of that. The defendant—even the defendant's story wasn't that. He didn't say that 'We had '—that 'I caught her on the phone' and that 'We argued over it.'  His . . . story was "I—beeping phone. I picked it up. And before I could even see anything, she came in the room and did this.'* [¶] *So the other jurors should say, 'Wait. There's no evidence. There's no testimony to point [to] that. We're going off the reservation when we talk about that testimony.*" (Italics added.)

> Appellant contends that the italicized language was a misstatement of the law because "it conveyed to the jury that [he] had the burden of producing evidence to prove his contention that he acted in self-defense." We are not convinced; however, even if the prosecutor committed misconduct and even if trial counsel should have objected, appellant has not demonstrated prejudice. He has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "Prosecutorial misconduct is cause for reversal only when it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant.'" (See *People v. Milner* (1988) 45 Cal. 3d 227, 245.)

48

Here, it is not reasonably probable that the result of the proceeding would have been different had defense counsel objected to the prosecutor's statement. First, as we have explained more fully ante, there was strong evidence of appellant's guilt of first degree murder. Second, it is not reasonably likely that the jury applied any of the prosecutor's statements in an objectionable manner. The jury was instructed that the attorneys' statements were not evidence and that it should decide the case based only on the evidence presented at trial. At the beginning of trial, the court instructed the jury pursuant to CALCRIM No. 200, "You must decide . . . as jurors what the facts are. You must use only the evidence that is presented in the courtroom. Evidence is the sworn testimony of witnesses, exhibits admitted into evidence, and anything else I tell you to consider as evidence. [¶] Nothing that the attorneys say is evidence." Later, the court reaffirmed this by telling the jury that they "must decide what the facts are. It is up to all of you and you alone to decide what happened, based only on the evidence that has been presented to you in this trial." Further, the trial court instructed the jury with CALCRIM No. 200, that if anything counsel said conflicted with the court's instruction, the jury must follow the court's instructions. In addition, the court told the jury that appellant was "presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt." The court properly advised the jury of the reasonable doubt standard. Finally, the court instructed the jury that the "People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

Taken together, these instructions properly informed the jury of the prosecution's burden of proof, and any assumed error in the prosecutor's rebuttal argument was not prejudicial. (*People v. Carey* (2007) 41 Cal. 4th 109, 130 [we presume jurors intelligent and capable of following trial court's instructions].) "In the absence of evidence to the contrary, we presume the jury understood and followed the court's instructions" and did not base its verdicts on any misstatement by the prosecutor. (*People v. Williams* (2009) 170 Cal. App. 4th 587, 635.)

In sum, appellant has not satisfied the second prong of the *Strickland* test in that appellant cannot show a reasonable probability that, absent the alleged deficient representation, the result of the proceeding would have been different.

*Swierski*, 2014 WL 6680126, **15-16 (emphasis in original).

### ii.     Analysis

Petitioner contends the prosecutor misstated the burden of proof based on the italicized language above, and that counsel was ineffective for failing to object.  Petitioner specifically argues as follows:

This was a misstatement of the law, because it conveyed to the jury that the defendant had the burden of producing evidence or to prove his contention that he acted in self-defense, and that the prosecution should reject that contention if "there's no evidence of that."  In fact, the prosecution has the burden of proving beyond a reasonable doubt that that the defendant did not act in self-defense, and the defense does not have to adduce any evidence at all.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Dkt. No. 19-3 at 57-58.

2   Respondent argues that Petitioner's claim fails because the prosecutor correctly stated the

3   law.  Dkt. No. 45-1 at 63.  Respondent states as follows**:**

> The prosecutor acknowledged, "The law is I have to prove to you the truth of the charge
> beyond a reasonable doubt." 11RT 1263.  He then proceeded to draw a distinction between
> a reasonable doubt and an unreasonable or imaginary one.  11RT 1263.  California courts
> have established that even "the rigid requirement of the reasonable doubt rule stops short of
> absolute certainty, free of some possible or imaginary doubt, for as has been so often said,
> 'such degree of proof is rarely possible.'" *People v. Andrews*, 234 Cal. App. 2d 69, 76-77
> (1965); *see* CALCRIM No. 220 ("Proof beyond a reasonable doubt is proof that leaves you
> with an abiding conviction that the charge is true.  The evidence need not eliminate all
> possible doubt because everything in life is open to some possible or imaginary doubt").  By
> stressing that a factually unsupported or confabulated scenario could not create a reasonable
> doubt or support a self-defense finding, the prosecutor correctly illustrated the limits of the
> reasonable doubt standard.  Defense counsel therefore had no reason to object.

*Id.*

The state appellate court reviewed this IAC claim based on the two-part test articulated in

*Strickland*.  *See Swierski*, 2014 WL 6680126, **15-16.  The state appellate court stated that it was

"not convinced" that the italicized language was a misstatement of the law, but it decided not to

elaborate on the first prong of *Strickland*, because it concluded that "even if the prosecutor

committed misconduct and even if trial counsel should have objected, [Petitioner] has not

demonstrated prejudice."  *Id.* at *16.

Based on the record presented, the Court finds that the state appellate court's rejection of

Petitioner's IAC claim does not constitute an unreasonable application of *Strickland*.  *See*

*Harrington*, 562 U.S. at 101.  The state appellate court noted that, as explained above, "there was

strong evidence of [Petitioner's] guilt of first degree murder."  *Swierski*, 2014 WL 6680126, *16.

The state appellate court also found that it was "not reasonably likely that the jury applied any of

the prosecutor's statements in an objectionable manner." *Id.*  The state appellate court noted that

the trial court properly advised the jury of the reasonable doubt standard, instructed them that the

attorneys' statements were not evidence, and that if anything counsel said conflicted with the

court's instructions then the jury must follow the court's instructions.  *Id.*  Thus, the state appellate

court determined that "[t]aken together, these instructions "properly informed the jury of the

1   prosecution's burden of proof, and any assumed error in the prosecutor's rebuttal argument was

2   not prejudicial." *Id.* Thus, even if counsel's performance were deficient, the state appellate court

3   reasonably determined that Petitioner had made no showing that, but for counsel's alleged error in

4   failing to object, there was a reasonable probability that the result of his trial would have been

5   different. *Id.* Petitioner does not dispute that the jury was correctly instructed by the trial court on

6   the burden of proof, and that the burden was borne by the prosecutor. 2CT 393.  The jury likewise

7   was instructed that the prosecution bore the burden of proving the killing was not in self-defense.

8   2CT 419.  The jury was also instructed to decide the case solely on the facts, that the arguments of

9   counsel are not facts or evidence, and if anything counsel says conflicts with the court's

10  instructions, the instructions control.  2CT 388-89, 394.  The jury is presumed to have understood

11  and followed those instructions.  *See Richardson*, 481 U.S. at 206; *see also Boyde v. California*,

12  494 U. S. 370, 384 (1990) (noting the "arguments of counsel generally carry less weight with a

13  jury than do instructions from the court").  The evidence of Petitioner's guilt also was

14  overwhelming, as discussed above.  *See supra* Section III.B.2.c.(1).  For the same reasons, there

15  was no substantial and injurious effect or influence in determining the jury's verdict.  *See Brecht v.*

16  *Abrahamson*, 507 U.S. at 637.

17      Therefore, relief on Petitioner's IAC claim based on trial counsel's failure to object to the

18  prosecutor's alleged misstatement of the law is denied.

19              **2)  Alleged Vouching for Eva**

20      Finally, Petitioner contends trial counsel was ineffective for failing to object to the

21  prosecutor's "vouching" for Eva during closing argument.  Dkt. No. 19-3 at 1.

22              **i.    State Court Decision**

23      The state appellate court gave the following background and then rejected this IAC claim

24  involving trial counsel's failure to object to the prosecutor's "vouching" for Eva during closing

25  argument as follows:

26      During closing argument, defense counsel asserted that the prosecutor had actively
    prevented Eva from communicating with a defense investigator. Defense counsel asked,
27  "Why? Why? Are they worried that I'm going to trick her, or are they worried that I'll
    actually get the real story of what happened? Not the story that they put together with her
28

United States District Court
Northern District of California

after speaking to her over and over again."

In his rebuttal, the prosecutor disputed defense counsel's allegations that he prevented the defense from communicating with Eva and that he coached her testimony. Specifically, the prosecutor told the jury "And, by the way, they . . . complained . . . 'Well, we didn't get a chance to talk to her before. And we tried to subpoena her, and she wouldn't talk to us.' Remember all that stuff? Again, not true. Not true. [¶] She came to the preliminary hearing, folks. January, 2011, she walked into court, Eva did. In front of a judge, got up on the witness stand, just like she did here, swore to tell the truth, and answered every question the defense threw at her. And was there a single question, then or here, about this story he told? They didn't ask her one question about it. Don't you find that interesting? [¶] They didn't ask her, 'Well, didn't he say to you that . . . this was an accident and that there was a fight?' They didn't even ask her. [¶] 'Didn't you, when you were in the bathroom, see . . . blood on the ground?' No questions. [¶] 'Didn't you see . . . this serrated back-scratcher knife?' Didn't even bother to ask her a question about it. Nothing."

Appellant contends that since the transcript of the preliminary examination was not before the jury, "this was a statement of facts not in evidence . . . .  Since the purpose of the prosecutor's statement was to assure the jury that he had personal knowledge of how [Eva] testified at the preliminary examination, which was not available to them and which supported Eva's veracity, it was also vouching."

Certainly, it is well-settled that "[i]t is misconduct for prosecutors to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.' [Citation.] Similarly, it is misconduct 'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' [Citation.] The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' [Citation.]" (*People v. Bonilla* (2007) 41 Cal. 4th 313, 336 (*Bonilla*).)

However, a prosecutor's comments cannot be characterized as improper vouching if the prosecutor's assurances regarding the honesty or reliability of a prosecution witness, or the strength of the case, are based on the facts of the record and inferences reasonably drawn therefrom, rather than from any purported personal knowledge or belief. (*Bonilla*, *supra*, 41 Cal. 4th at pp. 336–337.)

Our review of the record discloses no such improper comment by the prosecutor. The first part of the statement with which appellant finds fault ("She came to the preliminary hearing, folks. January, 2011, she walked into court, Eva did. In front of a judge, got up on the witness stand, just like she did here, swore to tell the truth, and answered every question the defense threw at her") was followed by a discussion of Eva's testimony in the trial, with the prosecutor pointing out that Eva was never asked by defense counsel about seeing blood in the bathroom or whether she saw the backscratcher knife. In the context of the prosecutor's rebuttal argument, there was no inference that he was vouching for evidence that had not been introduced at the trial. Appellant's claim fails on the merits because the prosecutor's statements were fair comment regarding appellant's failure to present logical evidence that would have supported appellant's defense. (*People v. Valdez* (2004) 32 Cal. 4th 73, 134 [prosecutor's comments did not mischaracterize evidence or assume facts not in evidence,

but merely commented on the evidence and drew permissible inferences therefrom].)

Furthermore, Eva testified that she had appeared at the preliminary hearing and had given the same account of appellant's actions on the night of Reina's death. She said that defense counsel was at the preliminary hearing and asked her "[a] lot of questions." Eva said that she answered all the questions.

The prosecutor did not attempt to bolster Eva's credibility by reference to facts outside the record. Rather, as can be seen, the prosecutor utilized facts established at the trial to establish how Eva testified at the preliminary examination. In light of Eva's trial testimony, the prosecutor's comments here were based on Eva's testimony. In essence, he urged the jury to credit Eva's description of the events because that description had remained consistent from the time of the preliminary hearing. The prosecutor made a fair comment on the witness's credibility and did not refer to facts outside the record. As a consequence, his argument did not constitute vouching and was not misconduct.

Trial counsel cannot be deemed to have provided ineffective assistance for failing to object to proper argument. In any event, the failure to object to evidence or argument "'rarely constitutes constitutionally ineffective legal representation . . . .' [Citation.]" (*People v. Huggins* (2006) 38 Cal. 4th 175, 252; accord, *People v. Ghent* (1987) 43 Cal. 3d 739, 772–773 [rejecting contention that counsel's failure to object during prosecutor's closing argument amounted to ineffective assistance because counsel might well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments]; *People v. Harris* (2008) 43 Cal. 4th 1269, 1290 [same].) Here, counsel could have decided that objecting would focus the jury's attention on the fact that she had not asked Eva any questions about the backscratcher knife or whether she had seen blood in the bathroom in ways that would not be helpful to the defense.

Appellant has not established any basis for finding ineffective assistance of his trial counsel.

*Swierski*, 2014 WL 6680126, **16-18.

### ii.    Analysis

Petitioner claims the prosecutor's rebuttal statements constituted vouching, and defense counsel was ineffective for failing to object to such statements. *See* Dkt. No. 19-3 at 1. As explained above, the state appellate court determined that no such vouching took place. *Swierski*, 2014 WL 6680126, *17.

Respondent argues that "the challenged remarks did not place '[the government's] own prestige behind the witness' or . . . 'indicat[e] that extrinsic information not presented in court support[ed] the witness' testimony.'" Dkt. No. 45-1 at 65 (citing *United States v. Simtob*, 901 F.2d 799, 805 (9th Cir. 1990)). Rather, Respondent claims that "the prosecutor argued facts elicited at trial to establish how Eva testified at the preliminary examination." *Id.* Respondent

further argues that during redirect, Eva testified that she had appeared at the preliminary hearing and given the same account of Petitioner's actions on the night of Reina's death. *Id.* (citing 6RT 506-07[12]). Respondent points out that defense counsel was at the preliminary hearing, at which she asked Eva a "lot of questions" and Eva answered them all. *Id.* (citing 6RT 508). Respondent reiterates that the prosecutor was making two points, stating as follows:

> The points of the prosecutor's remarks were one, that contrary to trial counsel's claim, the defense did have the opportunity to question Eva previously, at the preliminary hearing; and two, that the defense had not asked Eva any questions at trial suggesting Eva had testified differently at the preliminary hearing; her testimony had been consistent.

*Id.* at 65-66. Thus, Respondent argues that "in making those points, the prosecutor relied on Eva's testimony about her role in the evidentiary hearing." *Id.* at 66. The Court has reviewed the record and agrees with Respondent. Counsel are allowed wide latitude in argument, and may permissibly point out that the defense has not produced evidence, especially when the absence of evidence pertains to an assertion made by the defendant or his counsel. *See United States v. Ponce*, 51 F.3d 820, 831 (9th Cir. 1995); *United States v. Vaandering*, 50 F.3d 696, 701-02 (9th Cir. 1995); *United States v. Kessi*, 868 F.2d 1097, 1106 (9th Cir. 1989); *United States v. Castillo*, 866 F.2d 1071, 1083 (9th Cir. 1988).

However, even if trial counsel had failed to object to some of the prosecutor's aforementioned arguments at closing, Petitioner has made no showing that trial counsel's failure to object fell outside the bounds of reasonably competent professional assistance, or that he was prejudice by counsel's failure to interpose an objection.

First, under *Strickland*, Petitioner must show that trial counsel's failure to object to the prosecutor's argument was objectively unreasonable. *See* 466 U.S. at 687-88. The state appellate court reasonably rejected Petitioner's contention on the basis that trial counsel's decision to object or not to object during argument was a tactical matter, stating as follows: "Here, counsel could have decided that objecting would focus the jury's attention on the fact that she had not asked Eva

---

[12] Volume 6 of the Reporter's Transcript ("6RT") has been lodged by Respondent as Exhibit C. *See* Dkt. No. 46-4.

any questions about the backscratcher knife or whether she had seen blood in the bathroom in ways that would not be helpful to the defense." *Swierski*, 2014 WL 6680126, *18. Therefore, this Court finds that trial counsel's decision not to object to the prosecutor's comment falls squarely within the ambit of trial tactics and that counsel's actions were not objectively unreasonable. It is likely counsel chose not to object to the prosecution's rebuttal because any objection would have focused undue attention on the prosecution's statements. *See United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) ("From a strategic perspective . . . many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality."); *see also United States v. Young*, 470 U.S. 1, 13 (1985) ("[I]nterruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously."). Under these circumstances, the Court cannot say that counsel's failure to object to the prosecution's argument was professionally unreasonable. *Cf. United States v. Necoechea,* 986 F.2d 1273, 1281 (9th Cir. 1993) (defense attorney's failure to object during closing argument to prosecutor's vouching not ineffective assistance of counsel).

Secondly, Petitioner must also show that trial counsel's failure to object was prejudicial and that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir. 2008) ("[E]ven if [counsel's] failure to object was deficient, we cannot find that, but for his errors, there is a reasonable probability that the jury would not have still convicted [petitioner]."). Petitioner has failed to establish that the jury's ultimate finding of guilt would have been different had trial counsel objected to the prosecutor's aforementioned comments. Even if trial counsel had objected to the prosecutor's comments, there is no reasonable probability that the outcome would have been different. As mentioned, the overwhelming evidence of guilt presented at trial was sufficient to convict Petitioner regardless of the prosecutor's comments. *See supra* Section III.B.2.c.(1). Thus, Petitioner cannot show that he suffered any prejudice from defense counsel's alleged incompetence.

Therefore, the state appellate court reasonably rejected this IAC claim on the basis that (1) trial counsel's decision not to object to the prosecutor's comments was a tactical matter to

United States District Court
Northern District of California

1   which the court would defer, and (2) no prejudice resulted from counsel's failure to object.  Thus,

2   habeas relief on this IAC claim is also denied.

3       Accordingly, the Court has reviewed Petitioner's remaining IAC claims in his SAP and

4   concludes that, for the reasons outlined above, the state appellate court reasonably rejected these

5   claims on direct appeal and the state supreme court was objectively reasonable for rejecting them

6   on collateral review.  Therefore, the Court finds that Petitioner is not entitled to habeas relief on

7   any of his IAC claims, and Claim 10 is denied.

8                **7.**        **Cumulative Error (Claim 13)**

9       Petitioner claims he was prejudiced by the cumulative effect of the foregoing asserted

10   errors.  Dkt. No. 19-6 at 1-5.  In some cases, although no single trial error is sufficiently

11   prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a

12   defendant so much that his conviction must be overturned.  *Alcala v. Woodford*, 334 F.3d 862,

13   893-95 (9th Cir. 2003).  Where there is no single constitutional error existing, nothing can

14   accumulate to the level of a constitutional violation.  *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir.

15   2011).  Here, no constitutional error occurred.

16       Accordingly, Petitioner is not entitled to habeas relief on Claim 13.

17   **C.  Certificate of Appealability**

18       The federal rules governing habeas cases brought by state prisoners require a district court

19   that issues an order denying a habeas petition to either grant or deny therein a certificate of

20   appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

21       A judge shall grant a certificate of appealability "only if the applicant has made a

22   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

23   certificate must indicate which issues satisfy this standard, *Id.* § 2253(c)(3).  "Where a district

24   court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

25   is straightforward: [t]he Petitioner must demonstrate that reasonable jurists would find the district

26   court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S.

27   473, 484 (2000).

28       Here, Petitioner has not made such a showing, and, accordingly, a certificate of

1 | appealability will be denied.

2 | **IV.    CONCLUSION**

3 | For the reasons stated above, the SAP is DENIED, and a certificate of appealability is

4 | DENIED.

5 | The Clerk of the Court shall close the file.

6 | **IT IS SO ORDERED.**

7 | Dated:  11/9/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge